982 F.2d 1564
 The CATAWBA INDIAN TRIBE of SOUTH CAROLINA, Plaintiff-Appellant,
v.
The UNITED STATES, Defendant-Appellee.
 No. 92-5018.
 United States Court of Appeals,
Federal Circuit.
 Jan. 6, 1993.
 
 Don B. Miller, Native American Rights Fund, Boulder, CO, argued, for plaintiff-appellant.
 Katherine L. Adams, Environment and Natural Resources Div., Dept. of Justice, DC, argued, for defendant-appellee. With her on the brief were Miles E. Flint, Deputy Asst. Atty. Gen., J. Carol Williams and Andrew M. Eschen, Attorneys.
 Before MAYER, MICHEL, and PLAGER, Circuit Judges.
 PLAGER, Circuit Judge.
 
 
 1
 In this case, the Catawba Indian Tribe (the Tribe) alleges a series of wrongful acts by the United States Government which, the Tribe contends, caused substantial financial harm to the Tribe through the loss of some, if not all, of their ancestral lands.
 
 
 2
 After having failed in its effort to recover the actual lands themselves,[1] the Tribe now asks compensation for the loss, and, on the basis of the Tucker Act, seeks the aid of the United States Claims Court[2] in obtaining that compensation. The Claims Court, on the grounds that the relevant statutes of limitations have run against the Tribe's claim, dismissed the suit. Catawba Indian Tribe v. United States, 24 Cl.Ct. 24 (1991). The only question before us is whether the Claims Court was correct in so ruling. We hold it was and therefore affirm.
 
 I. BACKGROUND
 A.
 
 3
 While some would view the origins of this case to be the era when European adventurers came upon the vast North American continent and the peoples whose home it was, the legal issues in this case date from 1763. In that year the King of England conveyed to the Catawba Tribe, then occupying areas of what later became North and South Carolina, a 15 square mile tract, about 144,000 acres, to be their ancestral home.[3] The Tribe subsequently occupied that tract, now wholly within the boundaries of South Carolina.
 
 
 4
 The Tribe alleges that when the United States was formed, it succeeded to the position of the grantor, with all that entails. Over the years the United States did assume a trustee relationship with the various Native American tribes, including the Catawbas. In that capacity the Government undertook a number of actions intended to assist Native American tribes in their efforts to accommodate to the influx of others into the country.
 
 
 5
 One of these efforts took the form of an act known as the Nonintercourse Act. Under the terms of the earliest version of the Nonintercourse Act, effective in 1790, (now codified as re-enacted and amended at 25 U.S.C. § 177 (1988)), transfers of title to Native American lands were prohibited unless pursuant to a treaty approved by the United States.
 
 
 6
 Despite this law, and without approval from the United States, the State of South Carolina in 1840 negotiated with the Tribe an agreement--known as the Treaty of Nation Ford--under which the Tribe conveyed its entire 144,000 acres of ancestral lands to the State for $16,000 and a promise that it would be given a new reservation somewhere in the State as its tribal land.[4] Over the years the State conveyed that original 144,000 acre tract into private ownership, and title to it is now in some 27,000 different owners.
 
 
 7
 In 1940, the Federal Government undertook tripartite negotiations with the Tribe and South Carolina. South Carolina sought a release and quit-claim from the Tribe in exchange for its participation in a joint rehabilitation program. The Federal Government doubted the legality of this exchange and refused to agree. Then in 1943, the parties signed a Memorandum of Understanding which transferred to the Federal Government 3,434 acres to hold in trust for the Tribe. The Federal Government agreed to provide additional services, and the Tribe adopted a constitution. However, under the agreement the historic land claim remained intact, and unresolved.
 
 
 8
 In the 1950's, Congress decided to terminate the Government's trustee relationship with the various Native American tribes. A series of acts ensued, known as the Termination Acts. It was the manner in which the Termination Act applicable to the Catawba Tribe was negotiated and executed that gives rise to many of the Tribe's claims in this litigation.
 
 B.
 
 9
 The Tribe alleges that in 1958-59 a representative of the Bureau of Indian Affairs (BIA), on behalf of the Federal Government, undertook negotiations with the surviving members of the Tribe looking to an agreement under which the Government's trustee relationship to the Tribe would be ended, the Tribe and its members would be released from any special relationship to the Government, and the Government would no longer have responsibility for the well-being of the Tribe. During the course of these negotiations, the Tribe reasserted its long-standing grievance involving its ancestral lands. The Tribe alleges that it was assured that the termination of the Government's trusteeship would not affect its rights under that claim.
 
 
 10
 Subsequently, with the cooperation of the Tribe, a draft act was prepared and submitted to Congress. On September 21, 1959, the Catawba Indian Tribe Division of Assets Act, now codified at 25 U.S.C. §§ 931-938 (1988) (the Termination Act or Act), was enacted. Following affirmation by the Tribe members, as provided by the Act, the Termination Act became effective by declaration of the Secretary of the Interior on July 1, 1962.
 
 
 11
 Section 5 of the Act, now codified at 25 U.S.C. § 935, contains the following provision:
 
 
 12
 The constitution of the tribe ... shall be revoked by the Secretary. Thereafter, the tribe and its members shall not be entitled to any of the special services performed by the United States for Indians because of their status as Indians, all statutes of the United States that affect Indians because of their status as Indians shall be inapplicable to them, and the laws of the several States shall apply to them in the same manner they apply to other persons or citizens within their jurisdiction. (Emphasis added).
 
 
 13
 The meaning and effect of this particular section of the Act, and especially the emphasized language, is a central issue in the current dispute over ownership of the lands in question, the dispute which gave rise to this action.
 
 
 14
 In 1980 suit was brought in the Federal District Court of South Carolina on behalf of the Catawba Tribe against various private landowners, claiming ownership in the Tribe of the original ancestral lands. The specific parcels involved were among those that had long ago been conveyed by the State into private ownership. The landowners responded that, even if the Treaty of Nation Ford was invalid, as alleged, section 5 of the Termination Act made the Tribe subject to all State laws, including the South Carolina law on adverse possession. Under the State's law, any landowner who could prove ten years continuous adverse possession would be entitled to keep the land, even against the true owner.
 
 
 15
 The Tribe responded that, in view of the specific understandings with the Federal Government that accompanied the drafting and enactment of the Termination Act concerning the preservation of their historic claim, the Act could not have been intended to, and did not, have that effect. The District Court ruled in favor of the landowners in 1983.
 
 
 16
 On appeal to the Fourth Circuit, that court reversed, holding that ambiguous statutes affecting the Tribe should not be construed to their prejudice, and accordingly, the ambiguous phrasing of section 5 must be construed to exclude any congressional intent to adversely affect the Tribe's land claim. The Fourth Circuit held that the provision was intended only to end federal supervision and assistance. Catawba Indian Tribe v. South Carolina, 718 F.2d 1291, 1296-97 (4th Cir.1983), adopted en banc, 740 F.2d 305 (4th Cir.1984).
 
 
 17
 The Supreme Court granted certiorari and reversed the Fourth Circuit. The Court held that the Termination Act provision applied in all respects, and that the Tribe's claim to its land was subject to any adverse possession rights which may have accrued under South Carolina law. South Carolina v. Catawba Indian Tribe, Inc., 476 U.S. 498, 106 S.Ct. 2039, 90 L.Ed.2d 490 (1986). On remand to the Fourth Circuit, that court held that adverse possession for ten continuous years subsequent to July 1, 1962 would bar the Tribe's claims against individual possessors. 865 F.2d 1444 (4th Cir.), cert. denied, 491 U.S. 906, 109 S.Ct. 3190, 105 L.Ed.2d 699 (1989). Subsequently the District Court, on July 19, 1990, dismissed the Tribe's claims to parcels totalling about 75% of the original acreage. See 24 Cl.Ct. at 28.
 
 C.
 
 18
 Stymied in its efforts to regain its ancestral lands, the Tribe in 1990 turned to the Claims Court for relief under a new theory. The Tribe proffers seven claims upon which it argues monetary relief from the United States should be granted. Claims 1 and 2 allege breach of fiduciary duty based on the Government's permitting South Carolina to acquire the original lands, and subsequent failure to investigate and restore the Tribe to possession.
 
 
 19
 Claim 3 alleges a continuing breach of fiduciary duty to protect the viability of the Tribe's land claim, based, inter alia, upon the Government's conduct and affirmative acts before, during, and after the enactment of the Termination Act. The Tribe alleges that as part of the approval action by the Tribe, the Tribe was assured that nothing in the Termination Act would affect the Tribe's claim to its ancestral lands.
 
 
 20
 These alleged Governmental assurances turned out to be wrong, and form the basis for the Tribe's claim that the Government failed to protect the Tribe's land claim by a breach of a duty to notify the Tribe of the effect of the 1959 Termination Act (claim 4), breach of an implied-in-fact contract that the ensuing losses the Tribe sustained would not happen (claim 5),[5] and a Fifth Amendment taking of a vested property right--the claim to the land, rather than the land itself (claim 6).[6]
 
 
 21
 Finally, since much of the 144,000 acre tract is now permanently in possession of others pursuant to the State adverse possession provisions and the decisions in South Carolina v. Catawba Indian Tribe, supra note 1, the Tribe alleges that the Government has failed to distribute those specific assets to the Tribe in accordance with the Termination Act provision, 25 U.S.C. § 933, constituting a breach of a continuing duty to quiet title and distribute assets under the terms of the 1959 Termination Act (claim 7).
 
 
 22
 The United States moved for dismissal of the Tribe's claims on the grounds that whatever wrongful acts there may have been, any remedy available under the Tucker Act is barred because the Tribe waited too long to sue. The Claims Court dismissed all seven claims as barred by the Indian Claims Commission Act (ICCA) five-year statute of limitations, or alternatively by the six-year statute of limitations of the Tucker Act. In reviewing the propriety of this dismissal, we take as true the facts alleged by the Tribe in its complaint. W.R. Cooper General Contractor, Inc. v. United States, 843 F.2d 1362, 1364 (Fed.Cir.1988).
 
 
 23
 At oral argument the Tribe conceded, as it must, that any causes of action which accrued before 1946 were indeed barred by failure to have brought them before the Indian Claims Commission during the five year window provided under the ICCA, discussed in more detail below. But, the Tribe argues, there were a series of post-1946 events between the Tribe and the Government that constituted wrongs by the Government that are not barred by the ICCA. The only issue before us then is whether the alleged wrongs arising from these later actions are barred on the grounds that this suit, filed on June 21, 1990, was filed later than the six years allowed under the Tucker Act after the causes of action first accrued.
 
 II. DISCUSSION
 A.
 
 24
 As an initial matter, we address the Government's argument that the Claims Court correctly held that the ICCA bars all seven of the above-described claims. The ICCA states:
 
 
 25
 The Commission shall receive claims for a period of five years after August 13, 1946, and no claim existing before that date but not presented within such period may thereafter be submitted to any court or administrative agency for consideration, nor will such claim thereafter be entertained by Congress.
 
 
 26
 25 U.S.C. § 70k (1988).
 
 
 27
 The Government asserts that all seven of the Tribe's claims may be understood to be one single 'claim' within the meaning of the statute, because "all of the Tribe's claims stem from one basic contention--namely, that the Government had an obligation to protect the Tribe from the effects of the 1840 Treaty of Nation Ford, and it failed to do so." Because that 'claim' existed before August 13, 1946, it is now wholly barred by the ICCA. This is too broad a reading of the Tribe's claims.
 
 
 28
 The Tribe's claims are grounded upon three separate bases--claims 1 and 2 upon the Government's historical failure to restore the Tribe to ownership of its land; claims 3-6 upon the misrepresentations regarding the legal effect of section 5 of the Termination Act, 25 U.S.C. § 935; and claim 7 upon the obligations imposed on the Government by the Termination Act itself. While all seven claims may stem at some general level from the allegation of a unitary disregard by the Government for the Tribe's land claim, this is not enough to have brought claims 3-7 under ICC jurisdiction.
 
 
 29
 The three groupings of claims depend on different facts which occurred at different times. Indeed, the facts which led to claims 3-7 could hardly have been anticipated in 1946 or within the five year statutory period thereafter (by 1951), since the Federal Government did not announce its policy of terminating its trust relationships until 1953.
 
 
 30
 The Tribe concedes that 'historical' claims should have been brought by the 1951 deadline. Thus claims 1 and 2 are properly held to be barred by the ICCA, since these claims essentially reside in the Government's alleged ongoing failure to restore to the Tribe the land at issue. However, both the Government and the Claims Court err in equating the Government's passive failure to act to restore the land with the Government's alleged active representations that the Termination Act, effective in 1962, would not affect the Tribe's historic claim to the land.
 
 B.
 1.
 
 31
 Claims 3 through 6 (we address claim 7 separately, infra Part C) are not barred by the ICCA. The question remains whether, as the Government contends, they are barred by the Tucker Act six-year statute of limitations, 28 U.S.C. § 2501 (1988).[7] The text of this provision reads "[e]very claim of which the United States Claims Court has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues."
 
 
 32
 Claims 3 through 6 stem from the Government's alleged assurances that the land claim would be preserved despite the enactment of the Termination Act. As we know, it was not. The initial question is, when did the cause of action underlying these claims "first accrue" so as to begin the running of the Tucker Act statute of limitations? Suit was filed under the Tucker Act on June 21, 1990; the statute of limitations under the Act is six years. In order not to be barred, the underlying cause of action must have first accrued on or after June 21, 1984.
 
 
 33
 It is hornbook law that a claim does not accrue until all events necessary to fix the liability of the defendant have occurred--when "the plaintiff has a legal right to maintain his or her action." Corman, Limitation of Actions, § 6.1, p. 374 (1991). See also Nager Electric Co. v. United States, 368 F.2d 847, 851 (Ct.Cl.1966) (" 'First accrual' has usually been put, in broad formulation, as the time when all events have occurred to fix the Government's alleged liability, entitling the claimant to demand payment and sue here for his money.") The Tribe takes the position that the underlying cause of action did not accrue until the Tribe was 'damaged', because 'damage' was an event necessary to fix the Government's liability. The Tribe argues that it was not 'damaged' until it was clear that the Government's assurances about the legal effect of section 5 (to the effect that the historic claim had been protected from application of South Carolina law) were incorrect and that losses to the Tribe would ensue.[8] It was not clear, says the Tribe, that this was the consequence of the 1962 Termination Act until the Supreme Court so announced in 1986. Thus the cause of action accrued in 1986 and is not barred.
 
 
 34
 The difficulty with the Tribe's argument, creative though it is, is that it is contrary to one of the fundamental premises of our legal system. The argument assumes that the adverse effect of the 1962 Act did not become operative against the Tribe--the Tribe was not 'damaged'--until the Supreme Court some 25 years later so construed the Act. While the Supreme Court's pronouncement in 1986 might be relevant to fixing the time when the Tribe subjectively first knew what the Act meant, it is fundamental jurisprudence that the Act's objective meaning and effect were fixed when the Act was adopted. Any later judicial pronouncements simply explain, but do not create, the operative effect. See, e.g., Chevron U.S.A., Inc. v. United States, 923 F.2d 830, 834 (Fed.Cir.1991), Ide v. United States, 25 Ct.Cl. 401, 408 (1890), aff'd, 150 U.S. 517, 14 S.Ct. 188, 37 L.Ed. 1166 (1893), and Jones v. United States, 6 Cl.Ct. 531, 532-33 (1984). See also Menominee Tribe of Indians v. United States, 726 F.2d 718, 720-21 (Fed.Cir.), cert. denied, 469 U.S. 826, 105 S.Ct. 106, 83 L.Ed.2d 50 (1984) ("28 U.S.C. § 2501 is not tolled by the Indians' ignorance of their legal rights."), and Dion v. United States, 137 Ct.Cl. 166 (1956) (suit for damages flowing from government's alleged refusal to recognize plaintiff's civil service status was time-barred; "ignorance of one's legal rights does not toll the statute of limitations.").
 
 
 35
 This conclusion is reinforced in this case by the Supreme Court's explicit holding that the statute was unambiguous on its face. South Carolina v. Catawba Indian Tribe, Inc., 476 U.S. at 506, 106 S.Ct. at 2044. Whether the harm was caused to the Tribe by the Act itself or by Government misrepresentations about what the effect of the Act might be, the 'damage' was done when the Act became effective in 1962. At that time, possessors of the tribal lands holding under deeds from the State of South Carolina could begin to acquire adverse possession rights against the Tribe. The Government's duty to act, either affirmatively or by way of disclaimer, arose. Any suit based on the theories presented necessarily would have to have been filed by July 1, 1968.
 
 
 36
 Even if a different view is taken as to when the Tribe was irrevocably damaged, that it was 1972--the end rather than the beginning of the ten year adverse possession period under South Carolina law--when the first of the adverse possessors perfected title, suit should have been filed by July 1, 1978 at the latest. Under either view, the fact that the existence of this legal harm was not finally adjudicated until the Supreme Court opinion in 1986 is not determinative of the basic question of when the injury to the Tribe occurred.
 
 2.
 
 37
 Statutes of limitations sometimes expressly provide that under specified circumstances the running of the statute is suspended, or tolled.[9] Even if there is no express tolling provision applicable, courts may when circumstances require invoke the concept of tolling as an equitable matter.[10] As was explained in Japanese War Notes Claimants Ass'n v. United States:
 
 
 38
 In certain circumstances the running of the statute will be suspended when an accrual date has been ascertained, but plaintiff does not know of his claim. Ignorance of rights which should be known is not enough.... Plaintiff must either show that defendant has concealed its acts with the result that plaintiff was unaware of their existence, or it must show that its injury was "inherently unknowable" at the accrual date.
 
 
 39
 373 F.2d 356, 358-59 (Ct.Cl.), cert. denied, 389 U.S. 971, 88 S.Ct. 466, 19 L.Ed.2d 461 (1967) (citations omitted). Accord, Menominee Tribe of Indians v. United States, 726 F.2d 718, 721 (Fed.Cir.) cert. denied, 469 U.S. 826, 105 S.Ct. 106, 83 L.Ed.2d 50 (1984); cf. Hopland Band of Pomo Indians v. United States, 855 F.2d 1573, 1577 (Fed.Cir.1988).
 
 
 40
 The Supreme Court recently has confirmed that equitable tolling is available in suits against the United States:
 
 
 41
 Once Congress has made such a waiver [of sovereign immunity permitting suit to be brought against the Government within a specified time], we think that making the rule of equitable tolling applicable to suits against the Government, in the same way that it is applicable to private suits, amounts to little, if any, broadening of the congressional waiver.... We therefore hold that the same rebuttable presumption of equitable tolling applicable to suits against private defendants should also apply to suits against the United States.
 
 
 42
 Irwin v. Veterans Admin., 498 U.S. 89, 95-96, 111 S.Ct. 453, 457, 112 L.Ed.2d 435 (1990) (citing Glus v. Brooklyn Eastern District Terminal, 359 U.S. 231, 79 S.Ct. 760, 3 L.Ed.2d 770 (1959)).
 
 
 43
 As noted, a traditional ground for equitable tolling of a statute of limitations is based on the avoidance of penalizing a plaintiff simply because under the circumstances plaintiff did not and could not have known of the facts upon which the claim is based. See Corman, Limitation of Actions, § 11.1 (1991). Particularly is this the case when the facts necessary to know of the harm were intentionally withheld from the plaintiff by the defendant. Id. at § 9.7. But in the case before us, all the relevant facts were known. It was the meaning of the law that was misunderstood.
 
 
 44
 But let us put that distinction aside for the moment and assume, as the Tribe would have it, that their ignorance of the import of the law was grounds for equitable tolling. Let us assume further that the Tribe, despite the Supreme Court's pronouncement that the language of Section 5 was unambiguous, could not reasonably have known the import from the language itself. The question that then arises is, when was the earliest that the Tribe could reasonably be said to know, or should have known, that the Termination Act would be used against it in its efforts to reacquire its ancestral lands?
 
 
 45
 Up until 1980 it could be argued on these assumptions that the Tribe had no reason to believe that its understanding of the Termination Act (that the provisions did not affect its land claims) was incorrect. There is support for this. In 1977 the Solicitor of the Department of the Interior opined that the Act operated prospectively only, and did not affect pre-existing rights. South Carolina v. Catawba Indian Tribe, Inc., 476 U.S. at 517-18, 106 S.Ct. at 2049-50.
 
 
 46
 But in 1980, when the Tribe brought its title claims in the South Carolina District Court, the landowners raised as a defense the applicability of the state adverse possession law. The district court held that defense valid. At that point, the Tribe was fully on notice that the Government's earlier legal representations were subject to question, and could well be erroneous. Thus, even on the assumptions we have made about the Tribe initially not knowing or not having reason to know that the Government's representations regarding the legal effect of section 5 were wrong, the causes of action should have been sued upon at the latest by 1989, six years after the district court decision dismissing the Tribe's claim.
 
 
 47
 Under any of the above scenarios, when suit was filed in 1990, the six year statutory period for filing had run against these claims. The Government invoked the bar of the statute, as it was entitled under the law to do; the Claims Court correctly ruled that claims 3-6 must be dismissed.
 
 C.
 
 48
 Claim 7 speaks of a continuing duty of the United States "to quiet title to the lands of the 1763 Treaty reservation in the Tribe and distribute the proceeds among the members of the Tribe." This duty is premised upon the provision in the Termination Act, § 933, obligating the Government to distribute tribal assets. Under that provision, the Government had the duty to distribute to the Tribe all assets "held in trust by the United States" for the benefit of the Tribe, 25 U.S.C. § 932 (emphasis added).
 
 
 49
 If Claim 7 is understood to include a continuing duty that arose prior to the Termination Act, that part of the claim is little more than a restatement of the historical duty of Claim 2, considered supra. If, on the other hand, the claim alleges an obligation under the Termination Act on the part of the Government to distribute to the Tribe all lands to which the Tribe had an historical claim, and not merely those lands then actually in the control of the Government, the breach of that duty would not have occurred until after the effective date of the Termination Act. The question then is, when subsequently did the cause of action accrue for the alleged breach?
 
 
 50
 The breach of the Government's duty would have been evident in the way in which the Government implemented the Act. The Tribe's claim arguably accrued when the division of tribal assets was completed as part of the Termination Act process without inclusion of the ancestral lands. Alternatively, it accrued shortly thereafter--under the Termination Act, any "tribal asset" which was "not sold within two years from the date of the notice [of agreement to division of tribal assets published in the Federal Register]" was to be conveyed to a "trustee." 25 U.S.C. § 933(f). That notice was published in the Federal Register on July 1, 1962.
 
 
 51
 If the Government had viewed the land within the historical claim as a tribal asset, it would have been required to convey that land to a trustee. Since the Government failed to take any action regarding the historical lands, the Tribe had notice as of July 1, 1964 either that the Government did not consider those lands to be "tribal assets," or that the Government intentionally refused to convey them to a trustee. Under either interpretation the statute of limitations ran at the latest on July 1, 1970, for this claim.
 
 
 52
 In suits against the Federal Government, the Government has reserved the right to specify the terms of the law under which such suits may be brought. If that law does not permit an alleged wrong to be righted through a judicial remedy, the remedy must lie with Congress.
 
 CONCLUSION
 
 53
 The Claims Court dismissed all seven of the Tribe's claims. The Claims Court was correct in its dismissal since all seven claims are time-barred. Accordingly, the Claims Court judgment is affirmed.
 
 COSTS
 
 54
 No costs.
 
 
 55
 AFFIRMED.
 
 
 56
 MAYER, Circuit Judge, concurring in the judgment.
 
 
 57
 I would affirm on the basis that all seven claims are barred by the statute of limitations, 28 U.S.C. § 2501. Accordingly, discussion of any other bases is unnecessary, and I do not subscribe to it. Equitable tolling was not raised by any party to this litigation, and is a gratuitous offering by the court, which I decline to join.
 
 
 
 [1]
 See South Carolina v. Catawba Indian Tribe, Inc., 476 U.S. 498, 106 S.Ct. 2039, 90 L.Ed.2d 490 (1986), on remand, 865 F.2d 1444 (4th Cir.), cert. denied, 491 U.S. 906, 109 S.Ct. 3190, 105 L.Ed.2d 699 (1989)
 
 
 [2]
 The Claims Court was renamed the Court of Federal Claims on October 29, 1992. Federal Courts Administration Act of 1992, Pub.L. No. 102-572, § 902(a), 106 Stat. 4506 (1992)
 
 
 [3]
 The historical facts in this case are of record and largely undisputed. We need not set them out in full here, since they are given in considerable detail in the several prior opinions that have been written in this litigation, including the majority and dissenting opinions in the Supreme Court. South Carolina v. Catawba Indian Tribe, Inc., 476 U.S. 498, 106 S.Ct. 2039. We sketch them here only to put in context the specific events that the Tribe claims as the basis for this suit
 
 
 [4]
 The record reflects that the State, after some years, eventually provided the Tribe a 630 acre parcel at considerably less cost to the State than had been agreed
 
 
 [5]
 At oral argument before this court, the Government contended that the Supreme Court implicitly dealt with the issue of whether an implied-in-fact contract arose as a result of the negotiations related to the enactment of the Termination Act, and in effect determined that no such contract existed. Counsel for the Tribe, who argued the case in the Supreme Court, responded to a question with the statement that the issue of whether a contract arose was never raised or considered by the Court. While a close reading of the Supreme Court's opinions rendered in this matter supports the Tribe's view of the matter, in view of the manner of disposition of the case it is unnecessary for us to resolve this question
 
 
 [6]
 For purposes of this analysis, we assume that this claim for the historic lands is a property interest in the nature of a chose in action, and could be subject to 'taking' by the Government under the Fifth Amendment. See generally, Hendler v. United States, 952 F.2d 1364 (Fed.Cir.1991)
 
 
 [7]
 Claim 3 is not explicitly limited to conduct and affirmative acts in relation to the passage of the Termination Act. However, any claim based on historical acts relating to the loss of the ancestral land (or any other act occurring prior to August 13, 1946) is barred by the ICCA. Accordingly, we limit our discussion of Claim 3 to conduct and affirmative acts associated with the passage of the Termination Act
 
 
 [8]
 See United States v. Dickinson, 331 U.S. 745, 67 S.Ct. 1382, 91 L.Ed. 1789 (1947) (inverse condemnation action based on gradual flooding of plaintiff's land), Terteling v. United States, 334 F.2d 250 (Ct.Cl.1964) (suit seeking reimbursement for litigation costs), and Illinois v. United States, 15 Cl.Ct. 399 (1988) (state sued in Claims Court for reimbursement for emergency repair expenditures which were incurred during pendant District Court liability dispute amongst municipal, state, and federal entities)
 
 
 [9]
 The statute here at issue is tolled for "a person under legal disability or beyond the seas at the time the claim accrues...." Section 2501. No argument is made that this tolling provision is applicable to the facts of this case
 
 
 [10]
 The concurring opinion of Judge Mayer states that the question of equitable tolling was not raised by either party, and that the discussion thus is a gratuitous offering of the court. We do not agree. A central issue in the case, as framed by appellant, is "whether the Claims Court erred in holding that the Tribe's claims are barred by the six-year limitations period contained in 28 U.S.C. § 2501." A court in an appropriate case may temper the application of the bar in exercise of its equitable powers. See Irwin v. Veterans Admin., 498 U.S. 89, ----, 111 S.Ct. 453, 457, 112 L.Ed.2d 435 (1990). Under the circumstances of this case we would be remiss not to have considered all aspects of the issue presented by appellant. Cf. 5A C. Wright and A. Miller, Federal Practice and Procedure, § 1357, 336-37 (1990) ("The complaint should not be dismissed merely because plaintiff's allegations do not support the legal theory he intends to proceed on, since the court is under a duty to examine the complaint to determine if the allegations provide for relief on any possible theory.")