**ALDER TERRACE INC., a Washington Corporation, et al., Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

No. 96–500C.

United States Court of Federal Claims.

Sept. 4, 1997.

Bruce P. Babbitt, Seattle, WA, for plaintiffs.

Brian M. Simkin, Washington, DC, with whom were Assistant Attorney General Frank W. Hunger and David M. Cohen, Director, for defendant. Peter Giere, Department of Housing and Urban Development, Seattle, WA, of counsel.

## OPINION

ROBINSON, Senior Judge.

This action arises out of contracts between the Department of Housing and Urban Development ("HUD" or "the agency") and plaintiffs relating to the construction and operation of low- and moderate-income rental housing. Plaintiffs claim they were prohibited by congressional legislation from prepaying their mortgage after 20 years as allowed by contract and forced to remain subject to HUD regulations in violation of the original agreements. Currently, the case is before the court on defendant's December 3, 1996 Motion to Dismiss plaintiffs' complaint pursuant to Rule 12(b)(1), (4) of the Rules of the U.S. Court of Federal Claims. Plaintiffs filed their response in opposition on January 23, 1997, to which defendant replied on March 6, 1997. Oral arguments were heard on June 17, 1997, in the National Courts Building, Washington, D.C. For the reasons set forth below, defendant's motion to dismiss is hereby granted.

### Background

During the 1960s and 1970s, Congress enacted legislation to encourage private developers to construct, own, and manage housing projects for low- and moderate-income residents. Congress authorized HUD to provide mortgage insurance, below market interest rate loans, and interest rate subsidies to stimulate the private development of such housing. Plaintiffs agreed under section 221(d)(3) of the National Housing Act, as amended, 12 U.S.C. §§ 1715*l*(d)(3), 1715z–1, to construct and operate rental housing for low- and moderate-income residents. Plaintiffs further agreed to enter into regulatory agreements with HUD governing their operation. These agreements imposed significant restrictions on: the tenants to whom plaintiffs could rent; the rents the owners could charge; the profits they could receive; and the maintenance and financial operation of each project. Contemporaneous with the execution of the regulatory agreements, plaintiffs entered into long-term deeds of trust [1] with private lending institutions and executed secured notes. After final endorsement of these notes and deeds of trust by the Federal Housing Commissioner on December 26, 1968, Sparkman and McLean Company assigned the deeds of trust to the Government National Mortgage Association ("GNMA"). HUD endorsed the notes, and they were insured under section 221(d)(3) or section 236 of the National Housing Act and the accompanying regulations. The date of final endorsement by the Federal Housing Administration ("FHA") was January 5, 1969.

Simultaneous with the execution of the regulatory agreements and the notes, HUD and the lender entered into contracts for mortgage insurance. By their terms, the regulatory agreements were to remain in effect only as long as the mortgage insurance contacts between HUD and the lenders remained in effect, or during any time HUD held or was obligated to insure a mortgage on the project. The section 221(d)(3) notes endorsed by HUD FHA Form No. 1734, provided in part:

> The debt evidenced by this Deed of Trust Note may not be prepaid, either in whole or in part, prior to the final maturity date hereof without the prior written approval of the Federal Housing Commissioner, except a maker which is a limited dividend corporation may prepay without such approval after twenty (20) years from the date of final endorsement of this note by the Federal Housing Commissioner.

The section 236 notes endorsed by HUD FHA Form No. 41769–d, provided in part:

> The debt evidenced by this Deed of Trust Note may not be prepaid, either in whole or in part prior to the final maturity date hereof without the prior written approval

---

1. This Opinion, for the sake of convenience, uses the terms "mortgage" and "deed of trust note" interchangeably, although the court is aware of their distinctions, which are rooted in state law. *See* BLACK's LAW DICTIONARY 373 (5th ed.1979).

of the Federal Housing Commissioner, except where: (1) the prepayment is in connection with the release of an individual unit for sale to a lower income, elderly, or handicapped person; or (2) the maker is a limited dividend corporation which is not receiving payments from the Commissioner under a rent supplement contract pursuant to section 101 of the Housing and Urban Development Act of 1965, and the prepayment occurs after the expiration of twenty (20) years from the date of final endorsement. . . .

Consistent with the language of the HUD-endorsed notes, the HUD regulations that implemented sections 221 and 236 permitted limited distribution mortgagors to prepay their mortgages 20 years after endorsement and terminate their regulatory agreements with HUD. *See* 24 C.F.R. § 221.524(a)(1)(ii) (1986). Plaintiffs, who entered into the regulatory agreements pursuant to section 236, qualified as limited distribution mortgagors and were not receiving payments from the Commissioner under rent supplement contracts pursuant to section 101 of the HUD Act of 1965. Accordingly, plaintiffs were entitled under section 236, the HUD regulations, and their notes to: prepay their mortgages twenty years from the date of HUD's endorsement securing their mortgages; cancel their mortgage insurance; and use or dispose of their investments as they saw fit.

The Emergency Low Income Housing Preservation Act of 1987 ("ELIHPA"), 12 U.S.C. § 1715*l*, authorized HUD, subject to various conditions, to provide limited, specified incentives[2] to those owners who were unable to meet the conditions set forth in ELIHPA and who would be compelled to continue to operate their projects for the benefit of low-income tenants. Congress directed the Secretary to issue implementing regulations by May 21, 1988. However, HUD did not publish final implementing regulations until September 21, 1990. These regulations and HUD notices were to govern HUD's approval of plans of action ("POAs"), which the owners were required to submit in order to apply for·incentives. Plaintiffs submitted a proper notice of intent ("NOI") to prepay their mortgage, but upon being barred from prepayment, canceled their mortgage insurance. Their request to terminate their mortgage insurance was approved in July 1989 and became effective retroactively in December 1988.

The twenty-year prepayment date for plaintiffs' projects passed January 5, 1989. Nonetheless, plaintiffs were initially barred from prepaying their mortgages and terminating their regulatory agreements by Congress' enactment on February 5, 1988 of ELIHPA. This act compelled the owners to continue their participation in the government's housing programs by imposing an emergency moratorium on plaintiffs' right to prepay their mortgage balances or to cancel their mortgage insurance subject to the satisfaction of the Secretary of HUD ("Secretary"). The limitations on HUD's discretion to approve prepayments, found at 12 U.S.C. § 4108(a), provide in pertinent part:

The Secretary may approve a plan of action that provides for termination of the low income affordability restrictions . . . only upon a written finding that—

(1) implementation of the plan of action will not—

 (A) materially increase economic hardship for current tenants . . .;or

 (B) involuntarily displace current tenants (except for good cause) where comparable and affordable housing is not readily available determined without regard to the availability of Federal housing assistance that would address any such hardship or involuntary displacement; and

(2) the supply of vacant, comparable housing is sufficient to ensure that such prepayment will not materially affect—

 (A) the availability of decent, safe, and sanitary housing affordable to low-income and very low-income families or persons in the area that the housing could reasonably be expected to serve;

---

**2.** These incentives included: increases in subsidized rents and allowable distributions; access to restricted residual receipts or excess replacement reserve accounts; refinancing and withdrawal of a portion of the owner's equity; and additional financing for capital improvements.

(B) the ability of low-income and very low-income families or persons to find affordable, decent, safe, and sanitary housing near employment opportunities; or

(C) the housing opportunities of minorities in the community within which the housing is located.

On November 28, 1990, Congress passed the Low–Income Housing Preservation and Resident Homeownership Act of 1990 ("LIHPRHA"), 12 U.S.C. § 4101 *et seq.*, which continued the prohibition of mortgage balance prepayment. Section 4101(c) of LIHPRHA provided that "[a]ny prepayment of a mortgage on eligible low-income housing or termination of the mortgage insurance on such housing not in compliance with the provisions of this subchapter shall be null and void and any low-income affordability restrictions on the housing shall continue to apply to the housing." The conditions of LIHPRHA codified the temporary provisions set out in ELIHPA. For those owners unwilling or unable to continue their participation in the government's housing program, section 4110 prescribed the forced sale of the property by the owner to third-parties provided by HUD at a price determined by and subject to the agency's approval of financial assistance to prospective purchasers and the availability of funds. Congress directed HUD to issue implementing regulations under LIHPRHA by April 12, 1991. However, HUD did not issue final regulations until April 8, 1992, which did not become effective until May 8, 1992.

ELIHPA did not by its terms prohibit plaintiffs from terminating their regulatory agreements by means of canceling mortgage insurance. With regard to such cancellation, however, the insurance contracts provided that they could terminate upon receipt by the Secretary of a written request by the mortgagor and the mortgagee or lender on a form prescribed by the Secretary. A request for cancellation was to be accompanied by the original credit instrument and remittance of all sums to which the Secretary is entitled. The termination was to become effective as of the date these requirements were met. 12 U.S.C. § 1715t; 24 C.F.R. § 207.253(b).

In December 1988, plaintiffs caused Reilly Mortgage Group, Inc., the mortgage service, to send a request for voluntary termination of mortgage insurance to HUD. In response to that request, HUD placed an endorsement on the original secured note on July 31, 1989, stating that the mortgage insurance had been canceled and that the director of the Office of Finance and Accounting had signed HUD Form 9807. On August 1, 1989, HUD sent a letter to Reilly Mortgage stating that the mortgage insurance had been terminated effective December 1988 in accordance with its request and returned HUD Form 9807. At the time HUD approved the termination of plaintiffs' mortgage insurance, it interpreted ELIHPA to apply only to mortgage payments, leaving the owner free to terminate its mortgage insurance without complying with the same requirements as it would for prepayment. From July 31, 1989, to October 1, 1990, plaintiffs operated their properties outside of the regulatory agreements. In addition, HUD's Regional Office in Seattle, Washington removed plaintiffs' properties from its inventory of projects in July 1989 and performed no further services thereon.

After plaintiffs had terminated their mortgage insurance, Congress passed the Department of Housing and Urban Development Reform Act of 1989 ("Reform Act"), Pub.L. No. 101–235, 103 Stat.1987. Section 202 of the Reform Act, entitled "Clarification of Applicability to Voluntary Termination of Insurance," amended ELIHPA by explicitly including within its coverage mortgage insurance termination. Moreover, HUD had changed its position on voluntary termination of mortgage insurance, and the Seattle Regional Office determined that plaintiffs should again be under the regulatory control of ELIHPA. However, because it had previously approved plaintiffs' mortgage insurance termination, HUD was unable to bring plaintiffs back under regulatory control of its own initiative without the agreement of plaintiffs. Thus, HUD's Regional Office in Seattle championed a lawsuit against plaintiff, Alder Terrace Inc., on behalf of the tenants of that property by directly contacting Evergreen Legal Services to represent the tenants' interests, bringing

suit against that plaintiff in the U.S. District Court for the Eastern District of Washington and presenting offers of judgment directing that the earlier termination of mortgage insurance be vacated. The lawsuit filed by those plaintiffs, *Neufeld and Peterson, Et al. v. HUD and Alder Terrace, Inc.,* No. CY–90–3057–FUS (E.D.Wash. July 9, 1990), sought a declaration by the tenants of Alder Terrace that the termination of the mortgage insurance was wrongful and not in compliance with ELIHPA.

### Contentions of the Parties

As background to the instant motion to dismiss, the court provides the following statement of plaintiffs' original contentions. Based on the above congressional actions, plaintiffs claim they have been barred from canceling their mortgage insurance or transferring their property to third-parties. In addition, plaintiffs claim they have become embroiled in litigation with third-parties as a direct consequence of the government's breach. Plaintiffs contend that, as a result of this breach, they: have been compelled to convey property to a third-party; have suffered a great financial loss; and have been deprived of the ability to enjoy and dispose of their property. Plaintiffs filed their complaint in this court on August 13, 1996, in which they contend that HUD's standards set forth in ELIHPA were impossible for plaintiffs to satisfy, because the government anticipated plaintiffs' exercise of their right to prepay their mortgages and withdraw their properties from the government housing programs and, therefore, made no alternative housing available in the area where plaintiffs' projects were located.

Plaintiffs' complaint further alleges that HUD's actions in U.S. District Court violated HUD's duties of good faith and fair dealing and constitute a material breach or repudiation of its earlier contracts with plaintiffs. According to plaintiffs, the district court litigation exposed plaintiffs to ancillary litigation expenses in excess of $100,000 as well as a taking of their property. Plaintiffs assert that they first became aware of this breach or repudiation of their contract no earlier than October 1990 when HUD made its offer

of judgment in U.S. District Court. In October 1992, the U.S. District Court: (1) held that Alder Terrace had unlawfully terminated its mortgage insurance in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.;* and (2) restored the binding effect of the regulatory agreement. Plaintiffs in the present case claim their damages will not be completely ascertained until the closing of the district court ordered sale of Alder Terrace to the housing authority pursuant to that court's January 1993 judgment.

Defendant argues that plaintiffs' claims for breach of contract do not fall within the jurisdiction of this court since a claimant must file within the applicable statute of limitations, which by 28 U.S.C. § 2501, must be within six years after the claim first accrued. The government's alleged breach accrued at the enactment of ELIHPA or as of the property's twenty-year prepayment date. ELIHPA's effective date was on February 5, 1988, and the prepayment date of plaintiffs' property was January 5, 1989. Since plaintiffs' complaint was not filed until August 13, 1996, more than six years after either date, argues defendant, their claims for breach of contract and just compensation are barred by the six-year statute of limitations. In the alternative, defendant argues that plaintiffs have failed to state a claim to which relief may be granted in regard to plaintiffs' claim for statutory injuries because neither ELIHPA nor LIHPRHA provide a mandate for monetary damages due to delay in implementing incentive programs. Moreover, defendant notes that this statutory theory of recovery has already been considered and rejected by this court in previous lawsuits.

Plaintiffs challenge defendant's motion on several grounds. First, plaintiffs contend that as of December 1988, the effective date of the cancellation of the mortgage insurance, plaintiffs were not within the realm of HUD regulations at the time of the prepayment date. Effectively, they were out from under HUD and could not have known of the breach of contract. Second, plaintiffs were not aware until a district court order in October 1990 that they were in effect back under HUD's regulatory scheme. Third,

plaintiffs' damages were not ascertainable until the final judgment of the district court in January 1993. Thus, plaintiffs contend their complaint is timely because, contrary to defendant's assertions, their cause of action could not have accrued and the statute of limitations could not have begun to run in 1988 or 1989. Specifically, HUD allowed plaintiffs to take the property out of the regulatory program by the cancellation of the mortgage insurance and, therefore, no damages occurred until either after the district court order or the final district court ruling.

## DISCUSSION

■ The U.S. Court of Federal Claims, like its predecessors, is a court of limited jurisdiction. *Aaron v. United States,* 27 Fed. Cl. 295, 297 (1992); *Dynalectron Corp. v. United States,* 4 Cl.Ct. 424, 428, aff'd, 758 F.2d 665 (Fed.Cir.1984). Absent congressional consent this court lacks authority to consider claims and grant relief against the United States. *United States v. Testan,* 424 U.S. 392, 399, 96 S.Ct. 948, 953–54, 47 L.Ed.2d 114 (1976); *United States v. Sherwood,* 312 U.S. 584, 586, 61 S.Ct. 767, 769–70, 85 L.Ed. 1058 (1941); *Hart v. United States,* 910 F.2d 815, 817 (Fed.Cir.1990). This authority is limited by the extent to which the United States has unequivocally waived its sovereign immunity. *Testan,* 424 U.S. at 399, 96 S.Ct. at 953–54; *Sherwood,* 312 U.S. at 586, 61 S.Ct. at 769–70; *Dynalectron,* 4 Cl.Ct. at 428. Consent to sue is premised upon the Tucker Act, 28 U.S.C. § 1491, which provides that an action may be maintained in this court if and only if it is "founded either upon the Constitution or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." *Id.* § 1491(a)(1). The relevant statute of limitations, which is an "express limitation on the Tucker Act's waiver of sovereign immunity," *Hart,* 910 F.2d at 817, provides, "[e]very claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues." 28 U.S.C. § 2501 (1994). Section 2501 is jurisdictional and,

therefore, may not be waived by this court or the parties. *Hart,* 910 F.2d at 818–19; *Hopland Band of Pomo Indians v. United States,* 855 F.2d 1573, 1577 (Fed.Cir.1988). The statute of limitations is jurisdictional because it defines the circumstances in which this court may exercise the power it has been granted pursuant to the Tucker Act. When a claim is brought beyond the six-year limitations period, the case must be dismissed for lack of jurisdiction. *See Bray v. United States,* 785 F.2d 989, 992 (Fed.Cir.1986).

### I. *Plaintiffs' breach of contract claim accrued on the prepayment date.*

■ There is no dispute among the parties that the present action is governed by the statute of limitations set forth in 28 U.S.C. § 2501. There is, however, no shortage of dispute over the time plaintiffs' breach of contract claims actually accrued. Claim accrual occurs when "all the events which fix the government's alleged liability have occurred *and* the plaintiff was or should have been aware of their existence." *Hopland,* 855 F.2d at 1577 (emphasis in original). This court established in *Anaheim Gardens v. United States,* 33 Fed. Cl. 773 (1995), that breach of contract claims for the right to prepay HUD-endorsed mortgage balances accrues at the time of either enactment of ELIHPA or the property's twenty-year prepayment date, whichever is later. Here the prepayment date on plaintiffs' property was January 5, 1989, and ELIHPA became effective on February 5, 1988. This case was filed August 13, 1996, more than six years after the date the breach claim accrued.

Plaintiffs have mistakenly equated the accrual date of their breach of contract claims and the various dates they fully appreciated the damages therefrom. The latter dates are irrelevant to a statute of limitations analysis of a breach of contract claim. Effective December 1988, plaintiffs canceled their mortgage insurance, and they, therefore, considered themselves out from under HUD's regulatory strictures as of then. Thus, plaintiffs contend that at that time they had no reason to bring their claim for the January 5, 1989 breach. However, plaintiffs' request to cancel their insurance was

not approved until July 1989 (7 months after the prepayment date) and was effective retroactively. Thus, at the time of the prepayment date, plaintiffs were under HUD's regulatory control. Moreover, plaintiffs were well aware of their existing claims because they actually made a request to prepay their mortgage insurance in December 1988. This request was denied. These two events unequivocally demonstrate that plaintiffs knew of the existence of their mortgage prepayment claim at the time of the property's twenty-year prepayment date, the date their cause of action accrued as a matter of law.

The fact that plaintiffs might have been unaware of the potential degree of damages until the district court's order is not probative, much less dispositive, of the actual accrual date of their cause of action flowing from an alleged breach of contract. Plaintiffs' reliance on the "stabilization doctrine" is misguided. First articulated in *United States v. Dickinson*, 331 U.S. 745, 67 S.Ct. 1382, 91 L.Ed. 1789 (1947), the stabilization doctrine was established to apply when a particular event had taken place to determine the commencement of the limitations period. In *Dickinson*, the claim arose from an event that occurred as a gradual, continuing process, i.e., rising river pool levels as opposed to one unique and distinct event. The U.S. Supreme Court reasoned that a plaintiff is not required to resort to piecemeal or premature litigation and, instead, can wait until all the circumstances upon which a cause of action is premised have stabilized before filing suit. *Id.* at 748–49, 67 S.Ct. at 1384–85.

Plaintiffs would have the court extend the stabilization doctrine to encompass the time when breach of contract damages are finally ascertainable. Plaintiffs' request is inappropriate and contrary to law. Indeed, damages from a complex breach of contract are rarely ascertainable until after the conclusion of trial. While plaintiffs cite *Anaheim Gardens*

in support of their interpretation of the stabilization doctrine, this reading of that case is incorrect. The court in *Anaheim Gardens* merely referred to the stabilization doctrine in its analysis of when breach of contract occurred rather than when those plaintiffs became aware that they should sue for damages sustained. *See Anaheim Gardens*, 33 Fed. Cl. at 777. The court must determine basically the same question here, i.e., when the violation of prepayment rights occurred. Plaintiffs cannot be considered to have suffered any damages as a result of the prepayment restrictions until the date on which plaintiffs first could have exercised their contractual prepayment rights. Thus, this court held the limitations period began either as of the twenty-year prepayment date or the enactment of ELIHPA, whichever is later. *Anaheim Gardens*, 33 Fed. Cl. at 777. While a plaintiff cannot be expected to make an estimate of its damages when its prepayment rights are not even ripe, a plaintiff should surely know when its contractual rights have been breached. *See id.* at 777. The present case is an action for breach of contract, and the law is clear that such actions accrue as of the date of the breach, not as of the date plaintiffs first subjectively realize the utility of suing for the breach.

Moreover, plaintiffs' claims in the instant case did not arise out of a gradual or continuing process as in *Dickinson*. Rather, plaintiffs' claims arose out of a single event, the breach of contract on the prepayment date. The corresponding damages incurred from the government's breach and plaintiffs' appreciation of its impact may have been gradual events in this case, but the event fixing the time of the breach—the prohibition of prepayment—was a single event occurring on January 5, 1989. Plaintiffs' interpretation of the stabilization doctrine is similar to that of the plaintiffs in *Alder v. United States*, 785 F.2d 1004 (Fed.Cir.1986).[3] The plaintiffs in

3. The plaintiffs in that case relied on the stabilization doctrine in bringing a takings claim. From 1960 to 1969, plaintiffs operated a ranch and utilized an access road on federal land adjacent to their land under a permit from the Bureau of Land Management. In 1969, the government restored these lands to the San Carlos

Apache Indian Tribe making it part of their reservation. In 1970–1972, those plaintiffs obtained one-year permits from the tribe to continue their ranch operations. Then in early 1973, the plaintiffs were notified that no further permits would be issued by the tribe. Upon expiration of their last permit on June 30, 1973, the plaintiffs had

that case argued that their claim did not accrue until 1978, because they did not know until that time that their administrative remedy under Pub.L. 93–530 would be inadequate. Nevertheless, the Federal Circuit held that this administrative claim was separate and distinct and did not toll the statute of limitations vis a vis the takings claim. *Id.* at 1008–09. The court further stated that while in *Dickinson* the water impounded by the dam continued to rise, the plaintiffs' situation in *Alder v. United States,* 785 F.2d 1004 (Fed.Cir.1986), had stabilized such that their claim was not a continuing event as contemplated in *Dickinson. Id.* at 1008. Similarly in the present case, the prepayment date was the single event that determined the running of the limitations period. Plaintiffs' contention that the date used to measure the limitations period should be the date on which plaintiffs subjectively discerned the measure of damages from this single event rings hollow. January 5, 1989 was the date of the alleged breach of contract. Accordingly, the court finds that the limitations period began to run on that date, and plaintiffs' complaint, therefore, must be dismissed as untimely.

## II. The pendency of U.S. District Court litigation does not affect the limitations period.

 Plaintiffs also argue that they could not have been aware of the effects of ELIHPA and hence their damages until the district court's ruling. Yet, where breach of contract or takings claims are predicated upon an act of Congress or an agency's position as to the effect of the legislation, any damage is fixed for claim accrual purposes on the date the

act becomes effective, not upon later judicial interpretations thereof. *Catawba Indian Tribe of South Carolina v. United States,* 982 F.2d 1564, 1569–71 (Fed.Cir.1993). In *Catawba,* the court addressed the accrual date of breach of contract and Fifth Amendment taking claims arising out of 25 U.S.C. §§ 931–938 (the "Termination Act"), which modified the tribe's relationship with both the state and federal government. Officials of the Department of the Interior ("DOI") promised the tribe that the Termination Act would not affect the tribe's previously expressed claim that the State of South Carolina had unlawfully appropriated the Tribe's ancestral lands. Subsequently, the tribe had brought suit against private landowners in U.S. District Court, claiming ownership by adverse possession and asserting its rights to the lands in question. After prolonged litigation ending in 1986, the Supreme Court held that the Termination Act had the effect of extinguishing the tribe's rights to their ancestral lands. This holding was directly contrary to the DOI's original interpretation. *South Carolina v. Catawba Indian Tribe, Inc.,* 476 U.S. 498, 510–11, 106 S.Ct. 2039, 2046–47, 90 L.Ed.2d 490 (1986).

Four years after the Supreme Court's ruling and twenty-eight years after the statute's enactment, the tribe filed another lawsuit in the U.S. Court of Federal Claims to recover actual damages from the government. The government moved to dismiss that suit as barred by the six-year statute of limitations. The *Catawba* plaintiffs, like plaintiffs in the case at bar, attempted to rely upon *Terteling v. United States,* 167 Ct.Cl. 331, 334 F.2d 250 (1964),[4] in arguing that they were not dam-

no right to use the access road across tribal lands and had to cease their ranching operations, conceding that their fee interest no longer had any marketable value. 785 F.2d at 1008.

4. In *Terteling,* a construction contract provided that gravel pit sites were to be furnished without cost to the contractor by the government. The contractor took gravel from these sites only to be sued successfully by the site's former owners for monetary recovery of the gravel taken from the land. The contractors filed suit against the government three years later seeking indemnification for the judgments against them in the state court actions. In its defense, the government stated that under 28 U.S.C. § 2501 the statute of limitations had expired. The plaintiffs, citing the

stabilization doctrine from *Dickinson,* countered that at the time of the contract, it was impossible to establish a claim, and that only upon the conclusion of the state court litigation could the contractors ascertain the amount of their damages. In *Terteling,* unlike the case at bar, the dispute did not occur on a specified date but on a later date that was not discernible during the time of contract. The court held that where: (1) the government expressly stated that gravel pits would be furnished without cost to the contractors; and (2) the government failed to join the state court litigation against the contractors arising from the contract, the government was liable for litigation costs and expenses incurred by the

aged by the statute's operation until a later judicial ruling made clear its legal force and effect. Only after that time had damages ensued to plaintiffs. This argument is rejected here as it was in the Federal Circuit.

> While the Supreme Court's pronouncement in 1986 might be relevant to fixing the time when the Tribe *subjectively* first knew what the Act meant, it is fundamental jurisprudence that the Act's *objective* meaning and effect were fixed when the Act was adopted. Any later judicial pronouncements simply explain, but do not create, the *operative* effect.... Whether the harm was caused to the Tribe by the Act itself or by government misrepresentations about what the effect of the Act might be, the 'damage' was done when the Act became effective in 1962.

*Catawba,* 982 F.2d at 1570–71 (emphasis in original).

The district court's ruling in the instant case simply held that Alder Terrace Inc. had improperly terminated their mortgage insurance and restored the property to the strictures of the HUD regulatory agreement. Nonetheless, the alleged damage stemming from the breach was premised upon the prepayment restrictions not the district court order years later. Any damages incurred by plaintiffs regarding the district court proceedings are separate and distinct from any damages caused by the defendant's breach of the prepayment rights. In other words, the restrictions imposed by the regulatory agreements entered into by plaintiffs and by EL-IHPA, not the district court ruling, created the operative effect of the prepayment restrictions. All the events that purportedly fixed the liability of the government to plaintiffs had occurred on the day of the breach, i.e., the prepayment date. That plaintiffs' damages might have been further exacerbated by later events, including the district court litigation, is irrelevant to determining when plaintiffs' cause of action first accrued.[5] *See Anaheim Gardens,* 33 Fed. Cl. at 777.

Therefore, the court concludes that none of these considerations change the court's finding that plaintiffs' claim accrued on the twenty-year prepayment date. Thus, the statue of limitations operates as a jurisdictional bar to plaintiffs' breach of contract claims.

### III. *28 U.S.C. § 1500 is unavailing to plaintiffs' cause of action.*

■ During oral arguments, plaintiffs raised the possibility that this suit would be barred in the U.S. Court of Federal Claims, pursuant to 28 U.S.C. § 1500, pending resolution of the litigation in the U.S. District Court for the Eastern District of Washington. 28 U.S.C. § 1500 provides that this court "shall not have jurisdiction of any claim in respect to which plaintiff or his assignee has pending in any other court any suit or processes against the United States...." The court finds another HUD related case, *Boston Five Cents Savings Bank v. United States,* 864 F.2d 137 (Fed.Cir.1988), instructive in resolving this issue. In *Boston Five Cents,* HUD, over the plaintiff's objections, had authorized conversion of an apartment building in which the plaintiff held the mortgage to cooperative housing units. *Id.* at 137. Plaintiff filed suit in U.S. District Court seeking declaratory relief to stop this conversion. After summary judgment for defendant, appeal was taken and the judgment was vacated by the First Circuit. On remand, plaintiff moved to amend its complaint to include monetary damages. The defendant filed a motion to dismiss because this relief was available only in this court's predecessor, the U.S. Claims Court. The plaintiff's motion to amend was denied for inexcusable delay and defendant's motion was deferred. In the meantime, plaintiff filed its complaint for monetary relief in both the U.S. Claims Court and U.S. District Court to avoid the running of the statute of limitations. The district court granted a stay pending the original district court suit, and the U.S. Claims Court dismissed the complaint on the basis of 28 U.S.C. § 1500. *Id.*

contractors. *Terteling v. United States,* 167 Ct.Cl. 331, 340–41, 334 F.2d 250, 256 (1964).

**5.** Plaintiffs referred during oral arguments, although not in their filings, to a hypothetical raised by the court in *Catawba,* dealing with

ignorance of the import of law as acceptable grounds for the doctrine of equitable tolling. *Catawba,* 982 F.2d at 1572. This argument is unavailing to plaintiffs, since clearly the facts of this case do not merit consideration of that doctrine.

at 138. On appeal of this dismissal, the Federal Circuit stated that, although the same operative facts were in dispute, the relief requested in the district court was different and, therefore, the suit was not barred. The Federal Circuit reasoned that since the original action in district court did not outline a monetary claim, the plaintiff was not barred from bringing that claim in this court's predecessor. *Id.* at 138–39.

In the case at bar, the situation of plaintiffs is similar. There are two distinct claims for two different types of relief (injunctive and monetary) based on the same operative facts. The district court case in no way barred plaintiffs from bringing a timely breach of contract claim in this court. As in *Boston Five Cents,* jurisdiction over plaintiffs' monetary claim is exclusive to the U.S. Court of Federal Claims. Indeed, plaintiffs' own response to defendant's motion cited *United States v. Moseley,* 761 F.Supp. 90 (E.D.Mo.1991), holding that the district court lacks Little Tucker Act jurisdiction over claims against the United States exceeding $10,000. 28 U.S.C. § 1346(a)(2). Knowing that the district court lacked jurisdiction over their claims, plaintiffs should have filed suit in this court as a protective measure, as did the plaintiff in *Boston Five Cents.* Therefore, plaintiffs contention that 28 U.S.C. § 1500 would have barred jurisdiction in this court before the conclusion of the district court litigation is without merit.

## IV. *Plaintiffs' are not entitled to damages for HUD's alleged statutory violations.*

Lastly, plaintiffs claim entitlement to statutory damages for an injury they have allegedly suffered. Claims for such injuries are based on the notion that HUD: (1) failed to comply with the statutory timetable for proposing and promulgating final rules for implementing the incentive programs authorized by and set forth in LIHPRHA; (2) delayed in processing requests for incentives authorized by legislation; (3) failed to provide for retroactive payment of incentives; and/or (4) unlawfully promulgated appraisal guidelines that resulted in property value determinations below fair market value. Initially the court notes that these claims would not be time-barred because the statute of limitations did not accrue until April 12, 1991, when HUD was to issue the implementing regulations under LIHPRHA. These claims for violation of statute do run afoul, however, of RCFC 12(b)(4). As conceded by plaintiffs' counsel during oral arguments, virtually identical claims to damages for violation of statute were previously reviewed and rejected by this court. *See Cienega Gardens v. United States,* 33 Fed. Cl. 196, 223–24 (1995); *Anaheim Gardens v. United States,* 33 Fed. Cl. 24, 31–36 (1995).

The court, therefore, declines to engage in a lengthy, redundant academic exercise when its analysis of this issue has been set forth at length twice previously. The court finds no basis in either ELIHPA or LIHPRHA, case law, or the legislative history of either act to support plaintiffs' suggestion that Congress intended that HUD be financially liable to property owners for its failure to issue regulations in accordance with the statutory timetable. Further, the court disagrees that alleged injuries for regulatory delays or unfavorable, discretionary agency actions are redressable in this court in the face of clear statutory authority to the contrary. *See* 12 U.S.C. § 4115(c); *Cienega Gardens,* 33 Fed. Cl. at 223–24. Accordingly, the court grants defendant's motion to dismiss these claims for violation of statute pursuant to RCFC 12(b)(4) for failure to state a claim on which relief can be granted. In so doing, the court expresses no opinion as to whether plaintiffs may pursue an equitable remedy in an alternate forum for the injuries they allegedly sustained.

## CONCLUSION

Accordingly, after careful consideration of the arguments, briefs, and applicable law, the court GRANTS defendant's motion to dismiss for lack of jurisdiction as to Counts One and Two in plaintiff's complaint, and for failure to state a claim upon which relief can be granted as to Count Three. The Clerk of the Court is directed to enter judgment accordingly. No costs.

**IT IS SO ORDERED.**