SELDOVIA NATIVE ASSOCIATION,
INC., Plaintiff–Appellant,

v.

The UNITED STATES, Defendant–
Appellee.

No. 97–5034.

United States Court of Appeals,
Federal Circuit.

May 14, 1998.

R. Collin Middleton, Middleton & Timme, Anchorage, AK, argued, for plaintiff-appellant. On the brief was Robert Sato.

Joan M. Pepin, Attorney, Environment & Natural Resources Division, Department of Justice, Washington, DC, argued for the defendant-appellee. On the brief were Lois J. Schiffer, Assistant Attorney General, M. Alice Thurston and Bruce M. Landon, Attorneys. Of counsel was John T. Stahr.

Before RICH, LOURIE, and BRYSON, Circuit Judges.

BRYSON, Circuit Judge.

Seldovia Native Association, Inc. ("Seldovia"), a corporation organized under the Alaska Native Claims Settlement Act, brought this takings action seeking compensation from the United States for the value of certain lands in Alaska. Seldovia claims that recent administrative decisions of the Department of the Interior deprived Seldovia of its interest in the lands and constituted both a taking and a breach of the government's fiduciary obligations. The United States contends that no taking or breach of fiduciary duty occurred and that Seldovia's claims are barred by the statute of limitations. The Court of Federal Claims agreed with the United States and dismissed Seldovia's claims. *Seldovia Native Ass'n v. United States,* 35 Fed. Cl. 761, *modified,* 36 Fed. Cl. 593 (1996). We affirm.

I

The Alaska Native Claims Settlement Act ("ANCSA"), Pub.L. No. 92–203, 85 Stat. 668 (1971) (codified as amended at 43 U.S.C. §§ 1601–1629f), is a complex piece of legislation that fundamentally altered land rights in Alaska. The Act sought to achieve "a fair and just settlement of all claims by Natives and Native groups of Alaska, based on aboriginal land claims." 43 U.S.C. § 1601(a). Several years of hearings and detailed studies commissioned by Congress preceded the enactment of the ANCSA. *See, e.g.,* Federal Field Committee for Development Planning in Alaska, *Alaska Natives and the Land* (1968). Reports accompanying the final bills in the House and Senate indicate that Congress believed it had struck a fair balance among the competing interests. *See* S.Rep. No. 92–405, at 85–86 (1971); H.R.Rep. No.

92–523, at 4–6 (1971). The Act was well received by the major groups that stood to benefit from it, including the Alaskan Natives. *See, e.g.,* Robert D. Arnold, *Alaska Native Land Claims* at v, 145–46 (1976).

In the period leading up to the enactment of the ANCSA, there was substantial pressure on Congress to achieve a comprehensive resolution of Native claims. The terms of Alaska's entrance into the Union in 1959 granted the State the right to select up to 103 million acres of public lands. *See* Alaska Statehood Act, Pub.L. No. 85–508, 72 Stat. 339 (1958). Lands to which the "right or title … may be held by Eskimos, Indians, or Aleuts," however, were exempted from selection by the State. *See* Alaska Statehood Act § 4. Because the legal status of Native title to many lands in Alaska was uncertain, Native groups filed protective land claims encompassing approximately 300 million acres of land, or 80% of all the land in Alaska. In response to those claims, the federal government instituted a "land freeze" policy that halted the transfer of lands to the State or to private parties. That policy, however, could not be maintained indefinitely, particularly after the discovery of oil in northern Alaska in the 1960s. *See* S.Rep. No. 92–405, at 73, 96–98; *Alaska Natives and the Land,* at 442, 525–27.

The ANCSA authorized the transfer to Native Alaskans of 40 million acres of land and $962.5 million in direct payments and mineral royalties. *See* S.Rep. No. 92–581, at 38–39 (1971). In exchange, all Native land claims in Alaska based on aboriginal occupancy were permanently extinguished. *See* 43 U.S.C. § 1603. Congress declared that "the settlement should be accomplished rapidly, with certainty, in conformity with the real economic and social needs of Natives, without litigation [and] with maximum participation by Natives in decisions affecting their rights and property." 43 U.S.C. § 1601(b). In fact, implementation of the ANCSA has fallen considerably short of that objective. Instead of producing a quick and comprehensive resolution of Native land claims, many of the ANCSA's provisions have required extensive administrative involvement and generated protracted legal struggles. This litiga-

tion, which Seldovia initiated some 20 years after the enactment of the ANCSA to challenge the partial resolution of its land claims, exemplifies the difficulties that have been encountered.

The ANCSA did not convey land or money directly to individual Alaskans, but instead provided for distributions to be made to corporations that reflected preexisting Native organizations. The ANCSA required each of the approximately 200 Native villages to create "village corporations" to receive land grants. *See* 43 U.S.C. § 1607. The plaintiff in this case, Seldovia Native Association, Inc., is one such village corporation. On a larger scale, regional corporations were established to mirror existing regional Native associations. *See* 43 U.S.C. § 1606. The regional corporation to which the residents of Seldovia belong is Cook Inlet Region, Inc. ("CIRI").

To effectuate land distribution to the village corporations, the ANCSA established a three-step regimen—withdrawal, selection, and conveyance. The Secretary of the Interior was required to withdraw certain public lands for transfer. Withdrawals were made in units of "townships," a standard land surveying unit of 36 square miles (or 23,040 acres). The Secretary was required to withdraw all available public lands in the township in which any Native village was located, as well as all public lands in two concentric rings of townships around the village. *See* 43 U.S.C. § 1610(a). The withdrawal for each village would consist of all available public lands in the 25–township area including and surrounding the village.

Each village corporation was entitled to select a certain number of acres from the withdrawn land, based on the size of its Native population. *See* 43 U.S.C. § 1613(a). These selections were known as "12(a) selections," a reference to the pertinent section of the ANCSA. *See* ANCSA § 12(a), 43 U.S.C. § 1611(a). Seldovia's population entitled it to 12(a) selections totaling 115,200 acres, or the equivalent of five townships.

In some instances, the initial land withdrawals in the 25–township region were insufficient to allow the village corporation to select its full 12(a) entitlement. In heavily

populated areas, for example, the supply of public land was often quite limited. Land withdrawals were also limited to those public lands that were not already subject to "valid existing rights," see 43 U.S.C. § 1610(a), i.e., lands that had not already been designated to be used for parks, for strategic reserves, or for other purposes.

When the initial land withdrawals were inadequate, the Secretary was authorized to make further withdrawals, known as "deficiency withdrawals," from the nearest available public lands. The Secretary was directed, "insofar as possible," to withdraw public lands "of a character similar to those on which the village is located and in order of their proximity to the center of the Native village." 43 U.S.C. § 1610(a)(3)(A). In making deficiency withdrawals, the Secretary was required to withdraw three times the amount of the deficiency remaining after the initial withdrawal from the 25–township area. The village corporation could then complete its 12(a) selections from the deficiency withdrawals.

The ANCSA also provided a second means of land distribution to the village corporations. After each village corporation completed its 12(a) selections, section 12(b) of the ANCSA called for the Secretary to allocate additional lands to the various regional corporations based on the Native population of each region, until the sum of the 12(a) and 12(b) entitlements totaled 22 million acres. See ANCSA § 12(b), 43 U.S.C. § 1611(b). The regional corporations were required to reallocate the 12(b) acreage among the native villages in the region "on an equitable basis after considering historic use, subsistence needs, and population." 43 U.S.C. § 1611(b). As in the case of the 12(a) selections, if the supply of public lands in the initial withdrawal area surrounding a village proved insufficient to satisfy the village's 12(b) entitlement, the village corporation could select its remaining acreage from lands withdrawn by the Secretary in deficiency withdrawals.

Finally, the ANCSA provided for some land to be distributed to the regional corporations for their own use. The regional corporations were entitled to proportionate shares of 16 million acres and to the subsur-face estate in all the lands selected by the village corporations in their respective regions. See 43 U.S.C. §§ 1611(c), 1613(f); S.Rep. No. 92–581, at 35.

After the Secretary withdrew a particular parcel of land and a village or regional corporation selected it, the ANCSA contemplated that the Secretary would "immediately" convey the land by issuing a patent for it. See 43 U.S.C. § 1613(a), (e). In fact, however, the offices responsible for issuing the patents needed time to survey the land, ascertain that the selections were valid, and sort out any conflicting claims. As a result, the actual conveyance of land under the ANCSA often proceeded slowly.

The process of land withdrawal and selection did not go smoothly in the Cook Inlet region. The Cook Inlet region is the most developed and heavily populated area of Alaska. Much of the public land in the region had already been patented to the State of Alaska and therefore was not available for selection by the village corporations. See Alaska Natives and the Land, at 500. Several Native villages, including Seldovia, were located along the coast of the inlet, so that many of the encircling townships were completely or partially submerged. Some of the villages were also located in close proximity to one another so that their natural withdrawal areas overlapped. As a result, many of the village corporations in the region were unable to select their full statutory land entitlements from the townships surrounding their villages. The Secretary was thus forced to make deficiency withdrawals from other public lands in order to satisfy the villages' 12(a) and 12(b) entitlements.

Although the deficiency withdrawals for the Cook Inlet region contained sufficient acreage for each village corporation to complete its 12(a) and 12(b) selections, there were gross disparities in the value of the withdrawn lands. Some withdrawals along the western shore of Cook Inlet contained valuable timber resources and were highly desirable, while other tracts were located along glacial plains or in inaccessible mountainous areas. Rather than attempt to allocate lands of roughly equal value for each village in the region, the Secretary of the

Interior decided to allow all the village corporations to make selections from the entire deficiency withdrawal pool.

The village corporations in the Cook Inlet region encountered considerable difficulty in attempting to comply with the ANCSA rules and deadlines governing land selection and distribution. In fact, the entire selection process appears to have been plagued by imperfect communication and misunderstandings between the Department of the Interior, CIRI, and the various village corporations. Eventually, the ANCSA had to be amended to resolve the problems flowing from the 12(a) and 12(b) selections in the Cook Inlet region. Those amendments gave rise to the claims at issue in this case.

## II

Seldovia's takings claims are based on land that it chose in its 12(a) and 12(b) selections. Before any action was taken on Seldovia's selections, legislative amendments to the ANCSA redefined the pool of lands available for selection by the village corporations. As a result, some lands initially chosen by Seldovia were no longer available. Seldovia argues that its initial act of selection was sufficient to give it compensable rights in the selected lands and that later decisions by the Department of the Interior rejecting Seldovia's claims constituted a compensable taking of those lands.

Resolving the takings claims requires us to consider two distinct issues. The first is whether Seldovia's claims are barred by the statute of limitations. The government argues that, for any particular parcel, Seldovia's claim accrued on the effective date of the legislative amendment to the ANCSA that affected the disposition of that parcel. Seldovia argues that its claim with respect to a particular parcel did not accrue until the date of the Interior Department's decision denying Seldovia's rights to that parcel or transferring it to a third party. If the former, then Seldovia's claims are barred by the statute of limitations. If the latter, then Seldovia's claims are timely. The second issue concerns the extent to which Seldovia's act of selection gave it compensable property rights in the selected properties. That issue

turns on whether the process of selection under the ANCSA sufficiently fixes property rights in identifiable parcels of land.

Our analysis of the ANCSA amendment that affected Seldovia's 12(b) selections leads us to conclude that Seldovia's principal takings claims for the 12(b) selections arose when the amendment went into effect in 1978. As to those selections, there is no need to determine whether selection alone is sufficient to confer vested rights.

With respect to Seldovia's 12(a) selections, we hold that Seldovia's claims are not subject to the statute of limitations bar. Nonetheless, we conclude that those selections did not give rise to compensable property rights in the selected lands, for two reasons. First, we hold that the land selections made under the authority of the ANCSA did not have sufficient fixity or convey sufficient rights to support a takings claim. Second, many of Seldovia's 12(a) selections failed to comply with the requirements of the ANCSA and failed to give rise to property rights for that reason as well.

We address the statute of limitations issues first because they are jurisdictional. *See Bray v. United States,* 785 F.2d 989, 992 & n. 2 (Fed.Cir.1986).

### A. *Accrual of 12(b) Selection Claims—Kamishak Bay*

■ Seldovia filed this suit in February 1992, alleging a taking by the United States. Because the statute of limitations for takings claims is six years, *see* 28 U.S.C. § 2501, Seldovia's claims are timely only if they accrued after February 1986. Takings claims accrue on the date "when all events have occurred that fix the alleged liability of the Government and entitle the plaintiff to institute an action." *Alliance of Descendants of Texas Land Grants v. United States,* 37 F.3d 1478, 1481 (Fed.Cir.1994). Thus, the key date for accrual purposes is the date on which Seldovia was clearly and permanently deprived of the lands it had selected.

The total amount of land available for selection under section 12(b) was indeterminate until all of the village corporations completed their 12(a) selections. The Department of

the Interior was then responsible for proportionately dividing the 12(b) lands among the regional corporations. The regional corporations in turn were required to determine how many acres to allocate to each village corporation. The village corporations would then make selections of the allocated acreage from the available lands. Each of these actions had to be undertaken in a relatively compressed time frame, as the filing deadline for 12(b) selections was December 18, 1975, only one year after the 12(a) selection filing date. See 43 U.S.C. § 1611(c)(3).

Timely implementation of section 12(b) in the Cook Inlet region proved impossible. As the deadline for the 12(b) selections drew near, it became evident that CIRI would not be able to determine the acreage entitlement of each of the village corporations in the region. The Interior Department was able to provide CIRI with only a rough estimate of how much acreage would be available for 12(b) distribution to the village corporations. To complicate matters, it was uncertain whether two of the Native villages in the Cook Inlet region would be eligible to participate in the distribution.

In order to comply with the statutory filing deadline, all of the village corporations in the Cook Inlet region agreed to file a "blanket" selection of all the available lands, thereby preserving their rights to the land. CIRI filed the blanket application, which was signed by Seldovia and the other village corporations, on December 15, 1975. The blanket application covered approximately 2,350,000 acres of land, far more than the collective entitlements of all the village corporations.

During the same period, several of the village corporations, including Seldovia, held a meeting to make prioritized selections of the 12(b) lands. Many of Seldovia's high priority selections were located in the Kamishak Bay area, which lies directly opposite Seldovia on the western shore of Cook Inlet. Seldovia filed two applications with the Bureau of Land Management covering the selections it made at the prioritization meeting. No other village corporation filed an individual 12(b) land selection.

Throughout the 12(b) land selection process, CIRI, the United States, and Alaska were engaged in ongoing negotiations to resolve a number of disputes that had arisen during the implementation of the ANCSA in the Cook Inlet region. CIRI was displeased with the quality of lands that had been withdrawn for it under the ANCSA, and it had filed a lawsuit, joined by the village corporations, against the Secretary of the Interior. Both the United States and Alaska also wished to retain for other purposes land that had originally been withdrawn for allocation to the village corporations under section 12(b) of the ANCSA. The parties concluded an agreement, entitled the "Terms and Conditions," on December 10, 1975. The Terms and Conditions purported to resolve all outstanding issues among the parties.

On January 2, 1976, Congress enacted legislation adopting the Terms and Conditions. See Pub.L. No. 94-204, § 12, 89 Stat. 1150 (1976) (codified as amended at 43 U.S.C. § 1611 note). The purpose of the legislation was to effect an exchange of lands among the three parties. The land pool allocated for CIRI under the ANCSA was revised to include certain valuable oil-producing properties. The legislation designated certain lands in the Kamishak Bay area for conveyance to the State of Alaska, even though those lands had previously been part of the deficiency withdrawal made for the village corporations. The legislation further provided that Alaska's entitlement to the Kamishak Bay lands would take precedence over the villages' conflicting 12(b) selections, but not over their 12(a) selections. The lands that the United States wished to develop as a national park in the Lake Clark area had also been part of the original deficiency withdrawal, but under the Terms and Conditions legislation that land would not be available for selection by the village corporations. CIRI was additionally required to fulfill its obligation to reallocate 12(b) lands to the village corporations from a designated group of lands in the deficiency withdrawal. The legislation extended the filing deadline for the village corporations' 12(b) selections for another year, until December 18, 1976. See 43 U.S.C. § 1611 note.

The Terms and Conditions legislation required two pertinent conditions to be fulfilled

before it would take effect. First, CIRI and the village corporations had to dismiss with prejudice the lawsuit they had filed against the Secretary of Interior. *See* 43 U.S.C. § 1611 note. Second, Seldovia and the other village corporations had to agree to relinquish any selections they had made in the Lake Clark region that was designated to become a national park. *See* 43 U.S.C. § 1611 note. Thus, although the village corporations had not been parties to the Terms and Conditions agreement, they held an effective veto power over the legislative implementation of the agreement.

The Terms and Conditions legislation took effect in March 1978 when Seldovia agreed to dismiss the lawsuit against the Secretary and to relinquish its claims to 12(b) selections in the Lake Clark area. On the form on which Seldovia relinquished its Lake Clark selections, which were minimal, Seldovia added the following notation: "All other 12(b) selections made by Seldovia Native Association, Inc. shall remain valid."

As noted, Seldovia had previously filed its own 12(b) land selections in addition to the blanket filing made by CIRI on behalf of all the village corporations. Seldovia's takings claims are based on the selections it filed on its own behalf. Those claims can be broadly divided into two classes. The first consists of lands that Seldovia selected in the Kamishak Bay area on the western shore of the Cook Inlet. Some of those lands have since been transferred by the United States to the State of Alaska, while the remainder have been selected by the State but not yet approved for conveyance. As described below, the claim to the Kamishak Bay lands arose in 1978 and is now barred by the statute of limitations.

A second class of 12(b) selections that Seldovia argues were taken are lands selected by Seldovia that have since been transferred to CIRI pursuant to another agreement between CIRI and the United States. Because some of the takings claims based on those selections are not barred by the statute of limitations, we address those claims in section C, below.

■ The government argues that Seldovia's takings claims with respect to its Kam-

ishak Bay selections accrued when the Terms and Conditions legislation became legally operative. Relying principally on this court's decision in *Catawba Indian Tribe v. United States*, 982 F.2d 1564 (Fed.Cir.1993), the government contends that the Terms and Conditions legislation unambiguously barred Seldovia from receiving any of its 12(b) selections in the Kamishak Bay area. As such, the government argues, any takings claim for those lands accrued in 1978 and is now barred by the six-year statute of limitations.

For its part, Seldovia argues that the Terms and Conditions legislation did not terminate its entitlement to the lands it had selected. Rather, Seldovia contends that it retained an expectation of receiving its 12(b) selections until 1990, when the Interior Board of Land Appeals interpreted the Terms and Conditions legislation in a manner adverse to Seldovia. Accordingly, Seldovia argues, its takings claims are timely. In addition, Seldovia points out that the Department of the Interior still has not transferred all of Seldovia's 12(b) selections in the Kamishak Bay area to the State of Alaska. With respect to those lands, Seldovia argues that while its takings suit might be characterized as unripe, it cannot be untimely.

This court's decision in *Catawba Indian Tribe v. United States*, 982 F.2d 1564 (Fed. Cir.1993), is instructive on this issue. In 1962, Congress enacted a "Termination Act" that ended the trust relationship previously in effect between the Catawba Tribe and the United States. One of the provisions of the Termination Act was that the Tribe would thereafter be subject to all state laws, just like any other citizens. *Id.* at 1566.

In the 1980s, the Catawba Tribe began proceedings to reclaim certain ancestral lands that had been taken from it. 982 F.2d at 1567. In a 1986 decision, the Supreme Court rejected the Tribe's claims. The Court found that the Termination Act unambiguously subjected the Tribe to South Carolina laws, including the State's ten-year adverse possession statute. *Id.* at 1568. As more than ten years had passed between the Termination Act and the Tribe's suit, title to

the lands had irrevocably passed through adverse possession.

The Catawba Tribe then filed suit in the Claims Court, arguing that the government had taken its claim to the lands by virtue of assuring the Tribe that the 1962 Act would have no effect on those claims. 982 F.2d at 1568. The trial court dismissed the suit as untimely. This court affirmed, ruling that the statute of limitations on the Tribe's takings claim began to run in 1962, not on the date of the Supreme Court's decision in 1986. In pertinent part, the court held that the Termination Act's "objective meaning and effect were fixed when the Act was adopted. Any later judicial pronouncements simply explain, but do not create, the operative effect." *Id.* at 1570. Although the Tribe was unaware of the effect of the Termination Act, that did not toll the statute of limitations when the relevant facts were not inherently unknowable. *Id.* (citing *Menominee Tribe of Indians v. United States,* 726 F.2d 718, 720–21 (Fed.Cir.1984)); *see also Alliance of Descendants of Texas Land Grants,* 37 F.3d at 1481 (statute of limitations for takings claim began to run when treaty extinguished claims, not when claimants realized the effect of the treaty).

Under that analysis, we must determine whether the Terms and Conditions had an unambiguous meaning such that its effect was fixed when the agreement was enacted. The government argues that paragraphs III(A) and VII(A) of the Terms and Conditions unambiguously cut off Seldovia's rights in the contested 12(b) selections. We examine each section in turn.

Paragraph III(A) of the Terms and Conditions obligates the Secretary of the Interior to convey to Alaska "twenty-six (26) townships of land in the Talkeetna Mountains, Kamishak Bay, and Tutna Lake areas, the identities of which are set forth in Appendix E hereof." Appendix E of the Terms and Conditions, however, lists 33 townships of land and additional portions of another township. The preamble to Appendix E clarifies that the State's entitlement is to "the equivalent of 26.0 townships of land (599,040 acres) from the following described lands, subject to valid village selections under Section 12(a), but not 12(b), of ANCSA."

Seldovia argues that because Alaska was entitled to select only 26 of the 33 available townships, Seldovia had no reason to believe that all of its 12(b) selections in the Kamishak Bay area would be rejected. Accordingly, Seldovia claims it could not have brought a takings suit until Alaska had selected its full entitlement under paragraph III(A), because only then would Seldovia be able to ascertain which lands had been taken.

The government responds that the apparent discrepancy between the State's entitlement to only 26 townships and the 33 townships listed in Appendix E is misleading. Many of the townships listed in Appendix E are only partial townships. Because some of the townships are located along the coast of Cook Inlet, much of the land in those townships is submerged and therefore unavailable for selection. The government contends that it was understood by all parties that the actual amount of land represented by the 33 listed townships is approximately equal to the 26–township entitlement. The government concludes that Seldovia should have realized upon the enactment of the Terms and Conditions that all of the non-submerged land in the 33 townships would go to Alaska in satisfaction of the grant in paragraph III(A).

If the government's argument relied solely on paragraph III(A) of the ANCSA, it would fail. Paragraph III(A) grants a fixed amount of land to Alaska, to be selected from a specified list. Although the parties may have intended for all the land in Appendix E to go to the State, as the district court for the District of Alaska recently found in another case brought by Seldovia, that result is not immediately apparent from reading the statutory language. Notably, paragraph III(A) contains no language suggesting that the Appendix E lands are granted exclusively to Alaska, or that all competing claims in the area are extinguished.

It also appears that even now Alaska's entitlement relative to the total amount of property listed in Appendix E is unclear. Surveys of the lands listed in Appendix E are incomplete, so that the precise amount

of available acreage in the listed townships is unknown. A recent decision of the Interior Board of Land Appeals indicates that the available land in Appendix E exceeds the State's entitlement by approximately 12,600 acres. *See Seldovia Native Ass'n,* 113 IBLA 218, 224 n. 3 (1990). Another 30,000 acres have been withheld from transfer to the State pending a more complete survey. As Seldovia points out, its total 12(b) selections in the Kamishak Bay area amount to approximately 20,000 acres. Although the government emphasizes that Alaska had no obligation to make its selections so as to minimize conflicts with Seldovia's selections, it seems indisputable that Seldovia would not have been able to identify the lands that would go to Alaska (thereby creating a takings claim) until Alaska's full land entitlement was satisfied. For that reason, paragraph III(A) does not support the government's contention that Seldovia's takings claim accrued in 1978.

The government, however, has a second and more compelling argument. It points to paragraph VII(A) of the Terms and Conditions, which it contends limits Seldovia's 12(b) entitlement to areas other than Kamishak Bay. Paragraph VII(A) of the Terms and Conditions required CIRI to fulfill its obligation under the ANCSA to reallocate acreage to the village corporations by "allocat[ing] Section 12(b) selections to the following areas...." The listed areas do not include the lands Seldovia selected in Kamishak Bay.

In contrast to paragraph III(A), paragraph VII(A) unambiguously bars Seldovia from receiving any of its 12(b) selections from lands in the Kamishak Bay area. Paragraph VII(A) is a direct statement of how CIRI is to fulfill its obligations to distribute acreage among the village corporations. While paragraph VII(A) does not identify the particular parcels that Seldovia will receive in fulfillment of its 12(b) entitlement, it clearly restricts Seldovia and the other village corporations to making their selections in the specified areas. Seldovia's argument that paragraph VII(A) permits Seldovia to make selections in other areas is simply inconsistent with the plain language of the provision.

Unlike paragraph III(A), paragraph VII(A) leaves no room for interpretation by the Bureau of Land Management. Instead, paragraph VII(A) is similar to the Termination Act in *Catawba Tribe* in its specificity and clarity. From the day the Terms and Conditions became effective, Seldovia lost any rights it might have had in 12(b) selections outside the specified areas.

Seldovia argues that even if the Terms and Conditions clearly terminated the villages' rights to make 12(b) selections in the Kamishak Bay area, Seldovia was nonetheless required to seek an interpretation of the legislation from the Bureau of Land Management before instituting a takings suit. For that reason, Seldovia argues, its cause of action for a taking of the 12(b) selections in the Kamishak Bay area did not accrue in 1978, when the Terms and Conditions legislation became effective.

The premise of Seldovia's argument is flawed, because the decision to deny Seldovia land in the Kamishak Bay area was one made by Congress, not by the Department of the Interior. Thus, the taking, if there was one, was complete at the time the Terms and Conditions legislation went into effect. The unavailability of any administrative remedy for Seldovia's complaint regarding the Kamishak Bay lands distinguishes this case from *Hodel v. Virginia Mining & Reclamation Ass'n,* 452 U.S. 264, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981). In *Hodel,* the Supreme Court rejected a takings claim based on the enactment of the Surface Mining and Recovery Coal Act because the claimant had not made use of the opportunity to seek an administrative waiver specifically provided for in the Act. The Court viewed the claim as not ripe for judicial review, noting that "[i]f [plaintiffs] were to seek administrative relief under these procedures, a mutually acceptable solution might well be reached with regard to individual properties, thereby obviating the need to address the constitutional questions." *Id.* at 297, 101 S.Ct. at 2371. The Terms and Conditions described in this case have no similar provision allowing for an administrative waiver of either the land grant to Alaska or the restriction on the 12(b) selections of the village corporations.

Seldovia makes the further argument that it was unaware of the effect of the Terms and Conditions at the time of its enactment and points to various documents that support that contention. The documents include the addendum to the relinquishment that Seldovia signed to put the Terms and Conditions into effect, and a letter that Seldovia sent to the Secretary of the Interior. Those documents, however, pertain only to Seldovia's subjective understanding of the effect of the Terms and Conditions and are therefore irrelevant. As this court noted in *Catawba Tribe*, a subjective misapprehension as to the effect of a statute does not toll the statute of limitations. In addition, it is well established that a relinquishment of a land claim is not rendered ineffective because it was executed based on a mistaken factual belief. *See, e.g., Leo J. Kottas*, 73 Interior Dec. 123, 129–30 (1966) (relinquishment based on alleged misunderstanding effective in the absence of fraud or duress); *Harold N. Aldrich*, 73 Interior Dec. 70, 73 (1966) (relinquishment filed on mistaken advice of Bureau of Land Management effective); *cf. United States v. Santa Fe Pac. R.R.*, 314 U.S. 339, 356–58, 62 S.Ct. 248, 256–57, 86 L.Ed. 260 (1941) (tribe's request for establishment of reservation amounted to a voluntary relinquishment of other tribal lands, which could not later be rescinded).

Seldovia's subjective misunderstanding of the Terms and Conditions would be relevant only if it could show that the government affirmatively misled it as to the effect of the agreement. *See Alliance of Descendants of Texas Land Grants*, 37 F.3d at 1482 (intentional deception or fraud by the government could toll statute of limitations). Seldovia, however, has not presented evidence sufficient to raise any issue of misleading conduct on the part of the government. In sum, because paragraph VII(A) of the Terms and Conditions clearly barred Seldovia from receiving 12(b) selections in the Kamishak Bay area, Seldovia's claims to those lands accrued in 1978. Those claims are therefore time-barred.

### B. Accrual of 12(a) Selection Claims

The 12(a) land selection process in the Cook Inlet region gave rise to its own set of difficulties. To ensure that all villages received some valuable land and to avoid the problem of overlapping selections, the village corporations agreed to make their 12(a) selections in a series of rounds. The selections were made and timely filed with the Bureau of Land Management by the statutory deadline of December 18, 1974. *See* 43 U.S.C. § 1611(a)(1). Seldovia's 12(a) selections encompassed both lands from the townships surrounding Seldovia and other lands that were part of the deficiency withdrawals.

On May 18, 1976, the Bureau of Land Management issued a decision rejecting many of the 12(a) selection claims filed by Seldovia and the other village corporations in the Cook Inlet region. The rejection was based on the selection requirements of 43 U.S.C. § 1611(a)(2), which mandate that the 12(a) selections "shall be contiguous and in reasonably compact tracts ... in whole sections and, wherever feasible, in units of not less than 1,280 acres." The Bureau of Land Management determined that many of Seldovia's selections did not conform to the statutory rules, and that the village corporations could not waive the statutory requirements in an effort to attain a more equitable distribution of land.

The consequences of the Bureau of Land Management's ruling were potentially serious for Seldovia and the other villages. At that time, the ANCSA provided no means of waiving the statutory requirements or resubmitting invalid selections once the statutory deadline had passed. (A later amendment to the ANCSA allowed the Secretary of the Interior to waive the compactness and contiguity requirements when necessary). Thus, the Secretary's rejection carried with it the risk that the villages would lose a portion of their statutory land entitlement.

Seldovia and the other village corporations authorized CIRI to pursue a legislative resolution to the problem. The "12(a) Conveyance Agreement," as it was termed, called for CIRI to seek legislation to restore the villages' full 12(a) entitlements. The proposed mechanism was for CIRI to receive title to the invalidly selected lands from the United States and subsequently to reconvey those

lands to the village corporations. Under the terms of the 12(a) Conveyance Agreement, the 12(a) selections made by Seldovia and the other village corporations would govern the reconveyance from CIRI unless the parties agreed to the contrary. The 12(a) Conveyance Agreement was executed on August 28, 1976.

CIRI and the Department of the Interior promptly reached an agreement (the "CIRI/Interior Agreement") on August 31, 1976. The CIRI/Interior Agreement called for the transfer of certain withdrawn lands described in Appendix A of the Agreement to CIRI "as soon as reasonably possible" for reconveyance to the village corporations. The Agreement also recited that certain other public lands, described in Appendix C, were to be conveyed to CIRI for the village corporations "[t]o the extent the lands conveyed [from Appendix A] when added to lands otherwise heretofore received or to be received by such village corporations are insufficient to satisfy their statutory entitlement." The 12(a) Conveyance Agreement between CIRI and the village corporations was attached to the CIRI/Interior Agreement as Appendix B. On October 4, 1976, Congress enacted a statute that implemented the CIRI/Interior Agreement. *See* Pub.L. No. 94–456, § 4, 90 Stat.1935 (1976) (codified as amended at 43 U.S.C. § 1611 note).

Although the CIRI/Interior Agreement purported to solve the problem concerning the village corporations' 12(a) selections, the meaning of the Agreement immediately became the subject of dispute. The Department of the Interior insisted that the provisions of the CIRI/Interior Agreement required CIRI to take and reconvey all of the Appendix A lands to the village corporations before transferring any lands in Appendix C. CIRI and the village corporations contended that the original 12(a) selections took precedence, regardless of whether the selected lands were listed in Appendix A or in Appendix C. In particular, Seldovia wished to receive its 12(a) selections that were listed in Appendix C rather than being restricted to lands in Appendix A, which Seldovia considered inferior in quality. In December 1994, the As-sistant Secretary of the Interior issued an opinion rejecting Seldovia's and CIRI's position regarding the interpretation of the CIRI/Interior Agreement. That opinion was subsequently confirmed as a final agency decision. *See Cook Inlet Region, Inc.,* 132 IBLA 186 (Mar. 28, 1995). Recently enacted legislation specifically permits CIRI, Seldovia, and the other affected village corporations to bring suit in federal district court challenging the agency's interpretation of the CIRI/Interior Agreement. *See* Department of the Interior and Related Agencies Appropriation Act, Pub.L. No. 105–83, § 121, 111 Stat. 1543, 1566 (1997).

■ The government contends that any taking of Seldovia's 12(a) selections occurred upon the enactment of the CIRI/Interior Agreement because, in the government's view, that Agreement bars Seldovia from receiving any of its 12(a) selections from lands that are listed in Appendix C. Because the CIRI/Interior Agreement was enacted in 1976, the government argues that the statute of limitations bars Seldovia's 12(a) claims.

We disagree with the government about when the effect of the CIRI/Interior Agreement on Seldovia's 12(a) selections of Appendix C lands became fixed. Unlike the effect of paragraph VII(A) of the Terms and Conditions on the Kamishak Bay selections, the Appendix C lands were not permanently withheld from Seldovia under the CIRI/Interior Agreement. Even under the government's interpretation of the CIRI/Interior Agreement, it was still possible that Seldovia might be entitled to some or even all of its selections in Appendix C, depending on the extent to which it and the other village corporations were unable to fulfill their 12(a) entitlements from lands in Appendix A. The competing interpretations of the CIRI/Interior Agreement offered by the Secretary and the villages have also delayed final land conveyances that might have settled the question of how the Agreement would affect Seldovia's 12(a) selections. That question remained unresolved until 1994, when the Secretary issued a final decision rejecting any claim by CIRI or the village corporations to the lands in Appendix C. Therefore,

the date of that decision, rather than the date of enactment of the CIRI/Interior Agreement, marks the time at which all the events necessary to fix the liability of the United States had occurred and Seldovia's cause of action for a taking of its 12(a) selections accrued. Accordingly, the statute of limitations does not bar Seldovia's claims based on its 12(a) selections.

## C. Compensable Rights in Selected Lands

In the preceding sections, we have held that the statute of limitations bars Seldovia's takings claims based on its 12(b) selections in the Kamishak Bay area, but not the claims based on its 12(a) selections. With respect to the claims that are not barred by the statute of limitations, we must determine whether Seldovia's selections conferred rights compensable under the Fifth Amendment. Before addressing that question, however, we must determine the legal effect of the Bureau of Land Management's partial rejection of Seldovia's 12(a) selections.

■ As we have noted, many of Seldovia's 12(a) selections were rejected by the Bureau of Land Management for failure to comply with the statutory requirements of compactness, contiguity, and minimum acreage limitations. Those findings were never overturned, and we therefore take as established that Seldovia's initial 12(a) selections were at least partially invalid under the ANCSA. No additional selections were ever submitted. Because Seldovia agrees that only valid selections can confer property rights, any takings claims based on the invalidated selections must fail.

Nothing in the 12(a) Conveyance Agreement between CIRI and the village corporations (or the CIRI/Interior Agreement that was enacted into law) altered the legal effect of these initial selections. Both of those agreements were specifically aimed at remedying consequences flowing from the invalidity of the original selections. They did not purport to change the statutory requirements so that the original selections would be deemed valid under the ANCSA. They also did not contain any provision for resubmitting the village corporations' selections. Instead, the parties chose to remedy the problem by a direct transfer of land through CIRI. The parties may have anticipated that the village corporations would receive the same lands that were designated in their invalid selections, but their actions did not alter the legal status of those initial selections.

■ The broader question—whether rights vest under the ANCSA upon selection—has general applicability to both Seldovia's 12(a) and 12(b) selections. We conclude that selection under section 12 of the ANCSA is insufficient to convey compensable property rights, because selections by the village corporations lack fixity, i.e., selection does not sufficiently identify specific parcels in which rights are to be transferred. Under the ANCSA, village corporations may select lands far in excess of their entitlement, see 43 C.F.R. § 2651.4(f), and the same land may be selected by several village corporations. As a result, no village corporation can identify with certainty any parcel of land that it stands to receive until the Department of the Interior surveys the land, confirms the absence of preexisting rights to the land, and sorts out the competing claims to the parcel.

In an attempt to avoid these difficulties, Seldovia proposes some limitations on its general principle that selection is sufficient to confer compensable rights. Seldovia notes that each village corporation has a claim to only a fixed amount of acreage, so that no takings claim could be maintained for land in excess of that amount. In addition, Seldovia argues that because the village corporations are allowed to prioritize their land selections under the ANCSA, the lands in which each village corporation claims an interest can be identified with sufficient specificity. See 43 C.F.R. § 2651.4(f). To the extent that conflicts arise among village corporations with respect to specific parcels, Seldovia claims that the ANCSA already contains a dispute resolution mechanism, which provides the appropriate means for handling any problems. See 43 U.S.C. § 1611(e) (providing for arbitration among village corporations in case of disputes over land selection rights).

Neither of these points addresses the primary flaw in Seldovia's argument—that se-

lection alone does not adequately identify the lands that are to be conveyed to a village corporation. As the government points out, a village corporation is free until conveyance to change its priorities regarding the parcels it has selected. This adds to the fundamental indeterminacy of the land selections. Even in the case of high priority selections by a village corporation, other village corporations may assign a similarly high priority. Nor is it a sufficient answer to point to the arbitration process designed to resolve disputes among the village corporations as to how property rights should be allocated. The need for arbitration simply underscores the point that the rights of the village corporations are not fixed at the time of selection.

Moreover, the act of selection under the ANCSA does not give the selecting party the right to lease or convey the land selected, the right to exclude others from entering the land, or the right to control the disposition of any resources on the land. See 43 U.S.C. § 1621(i) (giving the Secretary of the Interior broad latitude to administer withdrawn lands prior to conveyance). Thus, Seldovia did not enjoy any of the rights usually associated with a compensable interest in property, such as "the right to possess, use and dispose of" property, see United States v. General Motors Corp., 323 U.S. 373, 377–78, 65 S.Ct. 357, 359–60, 89 L.Ed. 311 (1945), or the rights to alienate or to exclude others, see Nollan v. California Coastal Comm'n, 483 U.S. 825, 831, 107 S.Ct. 3141, 3145–46, 97 L.Ed.2d 677 (1987). See generally J. Sackman, Nichols on Eminent Domain § 5.01[5][b] (3d ed.1997).

In sum, following its land selections, Seldovia had an expectation of receiving a certain amount of acreage, but it had no vested right to a specific parcel of land. The land grant cases on which Seldovia relies are distinguishable on precisely that ground. In State of Wyoming v. U.S., 255 U.S. 489, 41 S.Ct. 393, 65 L.Ed. 742 (1921), and Payne v. New Mexico, 255 U.S. 367, 41 S.Ct. 333, 65 L.Ed. 680 (1921), the statutes at issue granted the States certain lands on which to establish state schools. If the land identified in the statute was unavailable for some reason, the States were permitted to make in lieu selections of other unreserved federal lands. The Court held that a valid in lieu selection of

land transferred equitable title to the States, even though the Secretary of the Interior acted to rescind the selections before a patent was granted. See Wyoming, 255 U.S. at 497, 41 S.Ct. at 395; Payne, 255 U.S. at 370, 41 S.Ct. at 334. Seldovia argues that those cases stand for the proposition that land rights vest upon selection, but the selections at issue in Wyoming and New Mexico were of specific, identifiable parcels. There were no overlapping selections, nor were the States free to alter their selections once they had been filed. After completing the selection procedures, the States exercised full control over the land even before a patent issued. See Wyoming, 255 U.S. at 495, 41 S.Ct. at 394. As the Supreme Court observed in Wyoming, the rights that adhere under land grant statutes must be analyzed according to the terms of the individual statute, id. at 508, 41 S.Ct. at 399, and under the statute at issue in that case, property rights vested with selection.

By contrast, the text of the ANCSA indicates that selection alone was not intended to convey vested rights in specific parcels of land. An amendment to the ANCSA provides for an "interim conveyance" of land for the period following selection but preceding issuance of a patent. See 43 U.S.C. § 1621(j) (added as part of the Alaska National Interest Lands Conservation Act ("ANILCA"), Pub.L. No. 96–487, § 1410, 94 Stat. 2371, 2496 (1980)). The amendment provides that title to lands which are subject to transfer to the village corporations but which have not yet been surveyed may be transferred by means of an interim conveyance, which would "convey to and vest in the recipient exactly the same right, title, and interest in and to the lands as the recipient would have received had he been issued a patent by the United States." In other words, an interim conveyance vests equitable title in the village corporation. The implication of that provision is that prior to its enactment, no such rights had yet been conveyed. If selection alone had been sufficient to give the village corporations vested rights in the land, the interim conveyance mechanism would have been unnecessary.

A more recent amendment to the statutory scheme further clarifies that no enforceable rights to identifiable parcels of land arise

from selection. Following the Exxon Valdez oil spill in Alaska, Congress amended ANIL-CA to provide that "[s]olely for the purpose of bringing claims that arise from the discharge of oil, the Congress confirms that all right, title, and interest of the United States in and to lands validly selected pursuant to the [ANCSA] by Alaska Native corporations are deemed to have vested in the respective corporations as of March 23, 1989." 43 U.S.C. § 1642; *see* H.R. Conf. Rep. No. 101–653, at 175 (1990), *reprinted in* 1990 U.S.C.C.A.N. 854. Again, this remedial statute would not have been necessary if, under the ANCSA, rights to land passed upon selection. In the amendment, Congress chose to vest rights "solely" for the limited purpose of bringing claims related to oil spills. In addition, the right to bring suit identified in section 1642 is effective only if a village corporation agrees to accept an interim conveyance with respect to a specific parcel of land. Thus, the text of the statute reinforces the point that it is conveyance, rather than selection, that confers compensable rights in identifiable lands.

Seldovia's argument to the contrary is based largely on section 1613(a) of the ANCSA, which provides that "immediately" after selection, the Secretary "shall issue" the village corporation a patent to the surface estate. Because that provision uses mandatory language, Seldovia argues that it should be construed to require equitable title to the selected properties to pass at the time of selection. The legislative history of the ANCSA, however, makes clear that section 1613(a) was meant simply to encourage prompt performance of the Secretary's duties. *See* S.Rep. No. 92–581 at 43 (explaining that the conveyance of lands provision of the ANCSA "parallels in structure and purpose" a Senate draft requiring the Secretary to "promptly survey" selected lands and then issue a patent). In light of the other provisions of the ANCSA indicating that equitable title does not pass automatically with selection, as well as the practical problems inherent in conveying equitable title to lands that have not been adequately identified, we do not believe that the use of the word "immediately" requires the ANCSA to be interpreted to grant compensable property rights upon selection.

Our decision is in accordance with the only other court decision to consider this question, *Cape Fox Corp. v. United States,* 4 Cl.Ct. 223 (1983). Although *Cape Fox* is not binding authority for this court, the trial judge in that case examined and rejected many of the same statutory arguments raised by Seldovia and characterized the rights arising upon selection as "contingent and speculative." *Id.* at 236–37. We agree that the selection procedures under the ANCSA do not envision the attachment of compensable property rights until title is transferred, either by interim conveyance or by issuance of a patent.

### D. *Diminution of Selection Rights and Survey Rights*

Seldovia raises two other takings claims, which require only brief discussion. Seldovia's complaint alleges that the Terms and Conditions and the CIRI/Interior Agreement effected a taking because they diminished Seldovia's 12(a) and 12(b) selection rights. That claim has no merit, because Seldovia's acreage entitlement remained unchanged following the implementation of the Terms and Conditions and the CIRI/Interior Agreement. Seldovia also alleges that the CIRI/Interior Agreement effected a taking of its survey rights under the ANCSA. Section 13 of the ANCSA requires the Secretary to "survey the areas selected or designated for conveyance to Village Corporations." 43 U.S.C. § 1612(a). The CIRI/Interior Agreement provides that the Secretary will survey only the exterior boundaries of the entire area to be conveyed to CIRI. To the extent that Seldovia may have a property interest in having its selections surveyed, and that the CIRI/Interior Agreement may have diminished that interest, that takings claim clearly would have arisen in 1976 when the CIRI/Interior Agreement became law. *See Catawba Indian Tribe v. United States,* 982 F.2d 1564 (Fed.Cir.1993). The operative effect of the CIRI/Interior Agreement with respect to surveying was fixed upon its enactment, and Seldovia's takings claim is now time-barred.

### III

Finally, Seldovia argues that the government breached its fiduciary duties to the corporation and is fully liable for the

value of the selected lands on that alternative ground. The Court of Federal Claims held that it had no jurisdiction over those claims because they failed to satisfy the requirements set out by the Supreme Court in *United States v. Mitchell,* 463 U.S. 206, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983). *Mitchell* held that a plaintiff claiming a breach of fiduciary duty must identify a statute that creates a trust relationship and mandates the payment of money for damages stemming from the breach of that trust relationship. *Id.* at 226–27, 103 S.Ct. at 2972–73; *see also United States v. Testan,* 424 U.S. 392, 400, 96 S.Ct. 948, 954, 47 L.Ed.2d 114 (1976).

The text and legislative history of the ANCSA make clear that Congress sought to avoid creating any fiduciary relationship between the United States and any Native organization. *See* 43 U.S.C. § 1601(b); S.Rep. No. 92–405, at 108 (1971). Moreover, there is no provision of the ANCSA that mandates the payment of money for failure to carry out the provisions of the statute. Accordingly, we agree with the Court of Federal Claims that it lacked jurisdiction over Seldovia's breach of fiduciary duty claims.

*AFFIRMED.*