Gerald T. CARR, et al., Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 03–1614C.

United States Court of Federal Claims.

July 16, 2004.

Austin Tighe, Austin, TX, for plaintiffs. Jerry Guerra, Law Offices of Jerry Guerra, of counsel.

Hillary A. Stern, Washington, DC, with whom was Assistant Attorney General Peter D. Keisler, for defendant. Capt. Kevin J. Mikolashek, U.S. Army Litigation Division, of counsel.

## OPINION

CHRISTINE O.C. MILLER, Judge.

This case is before the court after oral argument on defendant's dispositive motion.

Plaintiffs are current and former Federal Wage System supervisors employed at an Army installation who allege that their employment required them to work in areas where concentrations of asbestos fibers may have exposed them to possible illness or injury. They demand environmental differential pay. In 2000 an arbitrated grievance awarded non-supervisory employees at the same location environmental differential pay. Defendant seeks dismissal on jurisdictional grounds, pursuant to RCFC 12(b)(1), arguing that plaintiffs' claims are barred by the statute of limitations and asks for judgment that plaintiffs' amended complaint fails to state a claim, pursuant to RCFC 12(b)(6).

## FACTS

One hundred forty-three current and former Federal Wage System ("FWS") supervisors ("plaintiffs") are or were full-time employees at the Corpus Christi Army Depot (the "Army Depot").[1] The Army Depot is the Army's largest helicopter repair, overhaul, and maintenance center for all U.S. military services and many foreign military organizations. Plaintiffs allege that during the course of job performance they were exposed to asbestos or asbestos-containing materials.

This case follows an arbitrated grievance by the non-supervisory FWS employees that led to an award for past and future environmental differential pay ("EDP") for working under the same conditions as have plaintiffs. Union representatives of the non-supervisory employees had begun filing those grievances during September 1997.

Since 1986 the Occupational Safety and Health Administration ("OSHA") standard for workplace airborne exposure has been

---

**1.** According to plaintiffs, the First Amended Complaint lists 143 plaintiffs by name, 9 of whom are suing both individually and on behalf of the estate of a deceased. The original complaint names 119 plaintiffs, 2 of whom are suing both individually and on behalf of the estate of a deceased. Defendant agrees that 119 plaintiffs are listed on the original complaint, but finds 34 additional plaintiffs on the First Amended Complaint, for a total of 153.

Plaintiffs represented that they would submit a second amended complaint to include individuals who come forward to assert additional claims, as well as the estate of an individual who died after the filing of the First Amended Complaint. To date, no second amended complaint has been filed.

limited to 0.1 fibers per cubic centimeter. This standard for the permissible exposure limit (the "PEL") was established by the Department of Labor pursuant to the Occupational Safety and Health Act, 29 U.S.C. §§ 651–678 (2000). The corresponding regulation explains that the "employer shall ensure that no employee is exposed to an airborne concentration of asbestos in excess of 0.1 fiber per cubic centimeter of air as an eight (8)-hour time-weighted average (TWA) as determined by the method prescribed in Appendix A to this section, or by an equivalent method." 29 C.F.R. § 1910.1001(c).

While plaintiffs and defendant debate its meaning and applicability, Army Regulation ("AR") 40–5 (Oct. 15, 1990) covers the Army Occupational Health Program. The relevant provision reads, as follows:

> c. Army occupational safety and health standards are noted in (1) through (5) below. When alternate or supplemental standards are necessary, documentation with justification will be forwarded through command channels to HQDA . . . .
>
> (1) DOD and DA OSH standards for military and nonmilitary workplaces for which regulatory agencies either have or have not issued OSH standards. This includes DOD and DA pamphlets, circulars, technical bulletins, and messages.
>
> (2) OSHA standards including emergency temporary standards with minor adaption as necessary to conform with DA administrative practices.
>
> (3) Alternate workplace standards based on publications relating to workplace exposure criteria. These standards may be used in lieu of existing OSHA standards or in which no OSHA standard exists. The current American Conference of Governmental Industrial Hygienists threshold limit values will be the standards used in DA military and civilian workplaces if—
>
> (a) OSHA standards are less stringent.
>
> (b) No OSHA standard exists.
>
> (4) Other regulatory workplace standards issued under statutory authority by other Federal agencies (such as the Department of Transportation and the Environmental Protection Agency (EPA)).
>
> (5) Special DA OSH standards developed for military-unique equipment, systems, and operations.

AR 40–5–3(c). The current permissible exposure limit set by the American Conference of Governmental Industrial Hygienists is the same as the OSHA limit–0.1 fiber per cubic centimeter of air ("f/cc") measured as an 8–hour, time-weighted average.

Plaintiffs had been excluded from the prior grievance activities because they were supervisory employees and therefore ineligible for union representation. Forty of the current plaintiffs on May 21, 2001, filed their own grievance with the Army Depot requesting inclusion in the non-supervisory employee arbitration award. The depot commander denied this claim, in part, because it was not timely filed under the applicable administrative grievance procedures and, in part, because the award to non-supervisory employees did not extend to non-union supervisors, who were not covered as part of the collective bargaining agreements. In his memorandum of July 2, 2001, the commander also cited the Office of Personnel Management's (the "OPM") determination that " 'an agency's compliance with any applicable standards established by the Occupational Safety and Health Administration (OSHA) is sufficient to deny a claim for EDP.' "

Plaintiffs' subsequent claim to the OPM filed October 31, 2001, was denied on July 30, 2002. Plaintiffs denote the denial as a "final administrative settlement of the claim," Am. Compl. filed Oct. 6, 2003, ¶ 12, but complain that they have not had a "fully adjudicated administrative review of the merits of their claim." Pls.' Resp. to Def.'s Proposed Findings of Uncontroverted Fact, ¶ 22, filed Feb. 18, 2004.

Plaintiffs allege that asbestos is present throughout the Army Depot facility and that they were exposed to excessive levels of asbestos, such that a "February 29, 1999 dust sampling . . . revealed extraordinarily high asbestos dust levels in buildings 8, 49, 339, and 259." Am. Compl. ¶¶ 14–16. The "average indoor asbestos fiber measurement in those areas was almost 47–times higher than the measurement of outdoor, or ambient, air; which means, of course, that the readings in

some indoor areas were more than 47–times higher than ambient air." *Id.* ¶ 17. Plaintiffs initially had disagreed with defendant's statement that no evidence indicated that the average airborne asbestos concentration levels ever reached or exceeded 0.1 f/cc of air based upon an 8–hour time-weighted average, citing the expert testimony by Dr. Jonas Kalnas, a witness for the grievants at the arbitration hearing. During oral argument, however, plaintiffs conceded that no evidence indicates that any consistent tests have demonstrated that OSHA standards have been exceeded.

Plaintiffs base their claim for recovery of 8% of their hourly wages for their exposure or potential exposure to asbestos-containing materials on the Prevailing Rate Systems Act, 5 U.S.C. §§ 5341–5349 (2000), which recently was amended. The pertinent provision formerly provided for the payment of "proper differentials, as determined by the Office, for duty involving unusually severe working conditions or unusually severe hazards." 5 U.S.C. § 5343(c)(4). On November 24, 2003, Congress modified § 5343(c)(4) through § 1122 of the National Defense Authorization Act for Fiscal Year 2004, Pub.L. No. 108–136, 117 Stat. 1637 ("NDAA § 1122"). It now reads:

> [F]or proper differentials, as determined by the Office, for duty involving unusually severe working conditions or unusually severe hazards, and for any hardship or hazard related to asbestos, such differentials shall be determined by applying occupational safety and health standards consistent with the permissible exposure limit promulgated by the Secretary of Labor under the Occupational Safety and Health Act of 1970.

In describing the applicability of those amendments, the Act states:

> Subject to any vested constitutional property rights, any administrative or judicial determination after the date of the enactment of this Act concerning backpay for a differential established under sections

5343(c)(4) or 5545(d) of such title shall be based on occupational safety and health standards described in the amendments made by subsections (a) and (b).

NDAA § 1122. In addition to this claim for backpay, plaintiffs also request permanent injunctive relief mandating methodologies for the containment of asbestos material at the Army Depot.

## DISCUSSION

### 1. *Standard of review*

Defendant has moved to dismiss plaintiffs' complaint under RCFC 12(b)(1), arguing that the applicable statute of limitations precludes appropriate subject matter jurisdiction, and RCFC 12(b)(6), challenging the sufficiency of plaintiffs' amended complaint to state a claim upon which relief may be granted. Defendant also moved, in the alternative, for judgment upon the administrative record. This, however, is not a case invoking review of an OPM decision.[2] Rather, the court decides whether the Army Depot applied the correct standard in denying plaintiffs EDP. This case presents no semblance of an administrative record, and the court does not undertake a deferential review.

Whether a court possesses subject matter jurisdiction over a claim depends upon the "court's general power to adjudicate in specific areas of substantive law." *Palmer v. United States,* 168 F.3d 1310, 1313 (Fed.Cir. 1999). A motion to dismiss under RCFC 12(b)(1) may challenge the sufficiency of the jurisdictional allegations in the complaint. When a federal court hears such a facial challenge, "its task is necessarily a limited one." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Id.* The burden of proving that the Court of Federal Claims has subject matter jurisdiction over a claim rests with the party seeking

---

2. As defendant well knows, the OPM did not even purport to evaluate plaintiffs' arguments. *See* Memorandum dated July 30, 2002, to Gerald T. Carr, *et al.,* from OPM Contact Deborah Y. McKissick, stating, "where the written record presents an irreconcilable dispute of fact between a government agency and an individual claimant, the factual dispute is settled in favor of the agency, absent clear and convincing evidence to the contrary."

to invoke its jurisdiction. *McNutt v. Gen. Motors Acceptance Corp.*, 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936); *Trauma Serv. Group v. United States*, 104 F.3d 1321, 1324 (Fed.Cir.1997).

Insofar as defendant has moved to dismiss for failure to state a claim, the court has considered matters outside the pleadings, to wit, plaintiffs' response to defendant's proposed findings of uncontroverted facts and the appendices corresponding to the parties' respective briefs. Consequently, that motion is "treated as one for summary judgment and disposed of as provided in RCFC 56." *See* RCFC 12(b).

RCFC 56 provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." RCFC 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1323 (Fed.Cir.2001). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505; *Monon Corp. v. Stoughton Trailers, Inc.*, 239 F.3d 1253, 1257 (Fed.Cir. 2001).

Summary judgment will not be granted if "the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505; *see also Eli Lilly & Co. v. Barr Labs., Inc.*, 251 F.3d 955, 971 (Fed.Cir.2001); *General Elec. Co. v. Nintendo Co.*, 179 F.3d 1350, 1353 (Fed.Cir. 1999). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505; *see H.F. Allen Orchards v. United States*, 749 F.2d 1571, 1574 (Fed.Cir.1984) (noting that non-moving party shall "receive the benefit of all applicable presumptions, inferences, and intendments").

### 2. Statute of limitations

■ The statute of limitations is jurisdictional in the Court of Federal Claims. *Soriano v. United States*, 352 U.S. 270, 273, 77 S.Ct. 269, 1 L.Ed.2d 306 (1957); *Henke v. United States*, 60 F.3d 795, 798 (Fed.Cir. 1995); *Hart v. United States*, 910 F.2d 815, 817–18 (Fed.Cir.1990). Absent a contrary statutory provision, "[e]very claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues." ·28 U.S.C. § 2501 (2000). Because the limitations period is an express condition of the Government's consent to be sued, the court lacks power to toll the running of the statute of limitations on equitable grounds. *Hart*, 910 F.2d at 818–19.

■ A cause of action accrues when all of the events necessary to fix the alleged liability of the Government have occurred and the claimant legally is entitled to bring suit. *Catawba Indian Tribe v. United States*, 982 F.2d 1564, 1570 (Fed.Cir.1993); *Hopland Band of Pomo Indians v. United States*, 855 F.2d 1573, 1577 (Fed.Cir.1988). Ignorance of all the facts does not alone suffice to toll the statute of limitations. Plaintiff need only be aware of sufficient facts to know that a wrong occurred. *Japanese War Notes Claimants Assoc. v. United States*, 178 Ct.Cl. 630, 634, 373 F.2d 356, 359 (1967). It is not necessary that plaintiff be fully appraised of the merits of the claim or the extent of damages before filing suit. *Boling v. United States*, 220 F.3d 1365, 1371 (Fed.Cir.2000) (rejecting proposition that filing of lawsuit can be postponed until full extent of damages is known); *Catawba*, 982 F.2d at 1572 (holding that misunderstanding as to meaning of law does not toll accrual of cause of action when all relevant facts are known).

Defendant argues that the six-year statute of limitations, 28 U.S.C. § 2501, bars all claims for EDP prior to June 30, 1997, for the plaintiffs initially named and prior to

October 1, 1997, for the plaintiffs subsequently added. Anticipating this defense, plaintiffs allege that the Army Depot "affirmatively concealed from [p]laintiffs the asbestos exposure conditions at [the Army Depot], and the attendant entitlement to EDP for that exposure." Am. Compl. ¶ 29. They complain the Army Depot "actively concealed the conduct alleged herein by, inter alia, suppressing disclosure of this information and providing false, misleading or incomplete information of the conduct and conditions alleged herein." Id. ¶ 30. Defendant rejects plaintiffs' claim of fraudulent concealment because plaintiffs' "conclusory allegations regarding alleged 'fraudulent concealment,' without more, do not establish jurisdictional timeliness." Def.'s Br. filed Oct. 21, 2003, at 12.

Defendant's arguments must prevail. First, fraudulent concealment must be pleaded with particularity. See J. Geils Band Employee Benefit Plan v. Smith Barney Shearson, Inc., 76 F.3d 1245, 1255 (1st Cir.1996) (holding that fraudulent concealment to toll statute of limitations must be pleaded with particularity per Fed.R.Civ.P. 9(b)). To succeed on such a claim, plaintiffs would have to produce evidence indicating that defendant actively had concealed its wrongdoing; a mere failure to reveal facts is insufficient. Simmons Oil Corp. v. Tesoro Petroleum Corp., 86 F.3d 1138, 1142 (Fed. Cir.1996). Plaintiffs proffer no evidence indicative of fraudulent concealment other than a memorandum sent by the Army Depot's commanding officer in November 2001, which " 'declar[ed] the depot free of hazardous airborne concentrations of asbestos fibers as of 20 October 2001.' " Pls.' Br. filed Feb. 18, 2004, at 9. Combining this acknowledgment with allegations that post-abatement levels of asbestos were higher than those prior to abatement, plaintiffs seek to portray a pattern and practice of secrecy and misinformation by the Army Depot. This effort does not avail them because they have admitted that, "[a]s a result of the grievance brought by the WG employees' unions, [p]laintiffs realized that they also were entitled to EDP." Id. at 5. These grievances were filed "[a]s early as September[ ] 1997." Pls.' Resp. to Def.'s Proposed Findings of Uncontroverted Fact, ¶ 7. The facts alleged do not suggest any fraudulent concealment by the Army Depot.

The failure to substantiate any acts that would extend the period of recovery bars claims for EDP prior to June 30, 1997, for the initially named plaintiffs and prior to October 1, 1997, for the additional plaintiffs named in the amended complaint.

3. *Whether the Army Depot adopted OSHA standards in denying plaintiffs EDP*

Appendix A to 5 C.F.R. § 532, Subpart E, establishes 8% differential pay for employees "[w]orking in an area where airborne concentrations of asbestos fibers may expose employees to potential illness or injury and protective devices or safety measures have not practically eliminated the potential for such personal illness or injury." AR 40–5 was designed to "promote[ ] health and reduce[ ] risk of illness arising from the individual's work environment. This encompasses special preventive measures for both military and civilian personnel who are exposed or potentially exposed to toxic materials, infectious agents, or other hazardous influences of the work environment." AR 40–5–3a. It adopts OSHA standards unless the American Conference of Governmental Industrial Hygienists' standard is more stringent. AR 40–5–3c (3)(a ). In this case, those standards are identical.

According to defendant, the Army Depot had employed the OSHA permissible exposure limit of 0.1 f/cc as an 8–hour weighted average to establish the threshold for triggering EDP. The crux of defendant's argument is that, by not alleging that exposure levels at the Army Depot ever exceeded the OSHA standard, plaintiffs do not trigger any entitlement to EDP even were their allegations accepted as true.

Plaintiffs counter that 5 C.F.R. § 532, App. A, Subpart E, recognizes any exposure to asbestos as serving to establish an entitlement to EDP, based on the language quoted above. They complain of having "suffered actual or potential exposure to asbestos or asbestos-containing materials ('ACM') in the

course of performing their routine and required supervisory jobs," because these jobs could only be performed if plaintiffs were physically in the area that exposed them to asbestos or ACM. Am. Compl. ¶ 9. Work performed in any environment where the airborne concentrations of asbestos fibers may expose an employee to potential illness qualifies that individual for EDP, according to plaintiffs. The allegations of average indoor asbestos fiber measurements as 47 times higher than ambient air are cited by plaintiffs as support for their claim.

Defendant relies on *O'Neall v. United States,* 797 F.2d 1576 (Fed.Cir.1986), and *Howarth v. United States,* 41 Fed.Cl. 160 (1998), for the proposition that a quantitative level of exposure is a condition precedent to EDP entitlement.[3] Plaintiffs put forth these cases to support their position.

The *O'Neall* plaintiffs were civilian workers at an Air Force base who claimed EDP due to asbestos exposure. The Air Force "implemented the EDP program by making payments only when employees [had] been exposed to levels of asbestos dust which exceed[ed] 2 f/cc, which [was] the standard adopted by the Air Force for a safe working environment." 797 F.2d at 1578. At that time, although the "regulation contain[ed] no specified level of average exposure for entitlement to EDP," *id.* at 1579, the Air Force adopted the same standard as the OSHA PEL to comply with 29 U.S.C. § 668(a)(1) (1982), which required federal agencies to "provide safe and healthful places and conditions of employment." 797 F.2d at 1580 n. 4.

The Federal Circuit first held that the language of 5 U.S.C. § 5343(c) does not provide a clear entitlement to EDP whenever exposure to ACM occurs. The regulation itself does not establish a level so that it may adapt to improved knowledge concerning exposure and worker safety; yet a "threshold

must be set" in order to determine EDP entitlement because EDP may only issue upon exposure to "'potential illness or injury.'" 797 F.2d at 1581 (construing 5 U.S.C. § 5343(c)(4)). From this premise the court analyzed whether the Air Force acted reasonably in setting the OSHA PEL as the threshold for EDP entitlement and held that it did.

Despite the *O'Neall* plaintiffs' argument that it was error to incorporate the OSHA standards into the EDP regulations, the court distinguished the Air Force's action: The OSHA standard was not adopted, *per se,* by the Air Force. The level happened to coincide with OSHA levels at the time, and it was not improper for the Air Force to look to OSHA levels for guidance, as its goal is to attain the highest degree of health and safety for employees.

Plaintiffs in the case at bar attempt to avail themselves of this decision by pointing out that in *O'Neall* the Air Force "adopted an agency-wide regulation that set the permissible exposure level to asbestos at the same level as the OSHA PEL and used that standard to determine eligibility to EDP." Pls.' Br. filed Feb. 18, 2004, at 17. In contrast, plaintiffs contend that the Army Depot "has no agency-wide regulations or standards that set the PEL for asbestos exposure at the same rate as the OSHA PEL." *Id.* at 18. As defendant observes, however, the Army Depot set the standard for EDP at 0.1 f/cc, which corresponds to the standard employed by OSHA as its permissible exposure limit. This standard was consistent with the Army's Medical Services, Preventive Medicine Regulations, AR 40-5, in effect since October 15, 1990.

Ultimately, *O'Neall* provides support for defendant in terms of establishing a quantitative level corresponding to the OSHA standard. *O'Neall* acknowledged that 5 U.S.C.

---

3. *O'Neall* and *Howarth* are the main cases which treat this subject. While *Harris v. United States,* 841 F.2d 1097 (Fed.Cir.1988), also involves a claim for EDP, the case is not on point because the *Harris* claimant was a wage employee subject to a collective bargaining agreement, unlike the employees in the instant case. The *Harris* court held that, because plaintiff's union had agreed to arbitration as the exclusive procedure for resolv-

ing such grievances under the Civil Service Reform Act, the district court lacked jurisdiction under the Tucker Act to adjudicate his EDP claim. The court specifically withheld judgment as to the question of EDP claims for "a claimant class of nonmembers of the bargaining unit" and, indeed, suggested that such a group would not be foreclosed from bringing a class action suit. 841 F.2d at 1101.

§ 5343(c)(4) set out only "general parameters of entitlement" and ruled that the Air Force "acted reasonably" in applying the OSHA standard to guide the EDP determination. *O'Neall,* 797 F.2d at 1581.

The *Howarth* plaintiffs moved for summary judgment based on collateral estoppel after an arbitrator had awarded EDP to non-supervisory employees at a Veterans Administration (the "VA") Medical Center on the theory that "any exposure" to asbestos entitled the employees to EDP. 41 Fed.Cl. at 162. Similar to the instant case, plaintiffs in *Howarth* were supervisory employees who brought suit after non-supervisory wage-grade employees benefitted from an arbitrator's decision that any level of asbestos exposure entitled those employees to EDP. The court declined to give collateral estoppel effect to the arbitrator's decision because non-mutual offensive collateral estoppel may not be used against the Government (and only two *Howarth* plaintiffs received the benefit of the arbitrator's decision prior to their suit in the Court of Federal Claims) and "because collateral estoppel (mutual or not) is inapplicable to purely legal issues." 41 Fed.Cl. at 164. Plaintiffs in this case conceded at oral argument that this court is not bound by the arbitrator's decision.

In *Howarth* the union and the VA negotiated the standard for exposure in 1975. The VA adopted this negotiated standard, 0.1 f/cc, through Circular 00–87–49, issued in 1987. The *Howarth* court also granted summary judgment for defendant because "the PEL established by the VA [was] reasonable" and because plaintiffs "proffered no evidence to support a different standard that [was] at any specific quantified level above the 'any exposure' threshold set by the arbitrator." 41 Fed.Cl. at 166.

Plaintiffs' case differs in that they have alleged that the "*average* indoor asbestos fiber measurement in those areas was almost 47–times higher than the measurement of outdoor, or ambient, air." Am. Compl. ¶ 17. They also allowed during oral argument that, if 0.1 f/cc is the standard for exposure, the

court has an "easy decision." Nonetheless, plaintiffs embrace the penultimate sentence in *Howarth* to dictate a favorable result on their claims:

> Defendant's motion for summary judgment is granted because there is no genuine dispute that the VA PEL level was reasonable and that these individual plaintiffs were not exposed, unprotected, (1) to any level of airborne asbestos that was an unusually severe working condition or hazard, (2) to any level over the PEL established by the VA, or (3) to any level over the level usually present in ambient outdoor air.

41 Fed.Cl. at 167–68. Their case is distinguishable, argue plaintiffs, because the Army Depot did not promulgate an agency-wide regulation adopting the numeric value of the OSHA PEL for asbestos, which raises a genuine dispute as to whether the level used by the Army Depot was reasonable. In *Howarth,* by contrast, the union and the VA negotiated the 0.1 f/cc level in 1975, and the VA manifested the standard via Circular 00–87–49 in 1987. At the time 0.1 f/cc was twice as stringent at the OSHA PEL.

In addition to not constituting binding authority, *Howarth* does not mandate the result that plaintiffs advocate. Nothing in the instant case indicates a genuine dispute as to the reasonableness of the Army Depot's application of OSHA standards. AR 40–5 announces that OSHA standards are appropriate unless the threshold limits set by the American Conference of Governmental Industrial Hygienists are more stringent, which, indisputably, is not the case. Plaintiffs discount this corresponding value because AR 40–5, according to plaintiffs, does not indicate an agency-wide adoption of a standard. Defendant disagrees, arguing that the Army Depot had adopted 0.1 f/cc OSHA PEL for the period prior to the enactment of NDAA § 1122.[4]

AR 40–5 went into effect on October 15, 1990, as part of the Army's preventive medicine regulations. The goal of that program is to control preventable disease and injury

---

4. Defendant concludes, however, that NDAA § 1122 now "definitively establishes that the OSHA PEL is the controlling threshold level for

whether EDP shall be paid for working in areas where indoor airborne asbestos is present." Def.'s Br. filed Apr. 23, 2004, at 7.

through occupational and environmental protection programs. *See* AR 40–5. Adopting OSHA standards, or American Conference standards where more stringent, serves to reach this goal. The court need not decide, however, whether the promulgation of AR 40–5 constitutes an agency-wide adoption of the OSHA standard, because NDAA § 1122 dictates the appropriate standard for the time period in question for all affected agencies.

At the very least, *Howarth* and *O'Neall* stand for the proposition that nothing precludes an agency from adopting a standard that corresponds to the OSHA PEL. The Federal Circuit, analyzing the regulation that at the time contained no specified level of average exposure for EDP entitlement, did not hold that an agency must adopt a numeric standard, as opposed to adopting a standard that states a numeric value. The *O'Neall* court did not "discern ... a clear entitlement to EDP whenever a worker is exposed to asbestos dust." 797 F.2d at 1581. As for the establishment of a numeric value, the Federal Circuit rejected any implication that the OSHA numeric value was adopted *per se* and that looking to OSHA for guidance was improper. Rather, the Air Force's utilization of OSHA standards as a guide was appropriate because the OSHA objective of ensuring safe and healthful working conditions paralleled the objective under the EDP mandate to compensate employees whose work involves unusually severe hazards. In the instant case, the Army Depot's use of the 0.1 f/cc standard does not contravene Federal Circuit precedent.

### 4. *Amendment to Prevailing Rate Systems Act*

■ Amended 5 U.S.C. § 5343(c)(4) mandates that EDP correspond to the applicable OSHA guideline which for asbestos exposure is 0.1 f/cc. The language of the act facially is consistent with defendant's argument that Congress intended for this act to apply retroactively: "Subject to any vested constitutional property rights, *any administrative or judicial determination after the date of the enactment of this Act* concerning backpay for a differential established under section[ ]

5343(c)(4)" shall be based on OSHA standards. NDAA § 1122 (emphasis added).

Because any judicial determination in this case would be rendered after the date of enactment, November 24, 2003, the OSHA standards referenced in the statute apply. Plaintiffs therefore argue that they are asserting a constitutionally protected property right and that applying NDAA § 1122 retroactively would violate due process. Given that the Army Depot utilized the OSHA PEL standards prior to the enactment of the amendment, however, the change could not have compromised any due process rights afforded plaintiffs.

As explained in *Austin v. City of Bisbee*, 855 F.2d 1429, 1435 (9th Cir.1988), "retroactive application of a federal statute ... is not forbidden under the Constitution so long as due process requirements are met." The *Austin* court held that the police officer who sued the city for overtime pay under the Fair Labor Standards Act did not possess a cognizable property interest in the cause of action because such an interest would not have been definite or enforceable until reduced to a final judgment. The officer also lacked a vested right to overtime compensation because a property right defined by a statute disappears when its authorizing statute is amended.

The legal protections grounded on due process do not prohibit Congress from legislating with some retrospective effect, even where the legislation alters ingrained employer-employee expectations. *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 15–16, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976). Retroactive application of economic legislation satisfies due process as long as such an application is justified by a rational legislative purpose. *Austin*, 855 F.2d at 1436.

Plaintiffs assert a constitutionally vested property interest based on *Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). *Perry's* companion case, *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), ruled: "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expec-

tation of it. He must, instead, have a legitimate claim of entitlement to it." *Roth,* 408 U.S. at 577, 92 S.Ct. 2701. The Supreme Court in *Perry* held that a college professor's lack of a formal contract did not preclude his reliance on the school's *de facto* tenure program to establish a property interest in his continued re-employment; the college professor in *Roth* did not fare as well because he lacked a property interest in re-employment extending beyond the terms of his contract.

Plaintiffs' claims are distinguishable from *Perry* because they have not shown a legitimate claim of entitlement to any EDP. Nothing preceding enactment of the amendment by NDAA § 1122 precluded the OSHA levels from providing guidance as to the applicable PEL for asbestos exposure. Even assuming, *arguendo,* that plaintiffs worked in an area "where airborne concentrations of asbestos fibers may expose employees to potential illness or injury," 5 C.F.R. § 532, App. A, Subpart E, that circumstance alone is not a guarantee of entitlement to EDP. Were any doubt present prior to the enactment of NDAA § 1122, the statute now provides with utmost clarity that OSHA standards set the PEL for asbestos exposures. By plaintiffs' own admission, they do not show that these levels have been exceeded.

### CONCLUSION

Accordingly, based on the foregoing,

**IT IS ORDERED,** as follows:

1. Defendant's motion for summary judgment is granted.

2. By August 30, 2004, the parties shall submit (1) a list of plaintiffs with claims accruing prior to June 30, 1997, and (2) a list of those plaintiffs with claims accruing prior to October 1, 1997.

3. Based upon the list submitted pursuant to (1) hereof, the Clerk of the Court shall dismiss without prejudice for lack of subject matter jurisdiction plaintiffs' claims prior to June 30, 1997, for the initially named plaintiffs, and prior to October 1, 1997, for the additional plaintiffs named in the First Amended Complaint.

4. At the same time, the Clerk of the Court shall enter judgment for defendant with respect to the claims of all plaintiffs for the remaining claims period.

No costs.